### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ABINGTON CREST NURSING AND ) <br> REHABILITATION CENTER, *et al.*, ) <br>                                          ) <br>                          Plaintiffs, ) <br>           v.                         ) <br>                                          ) <br> MICHAEL O. LEAVITT                ) <br> Secretary, United States Department of Health ) <br> & Human Services,                 ) <br>                                          ) <br>                          Defendant. ) <br>                                          ) | Civil Action No. 1:06-CV-01932 (RJL) |

### PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56, Plaintiffs, by and through undersigned counsel, respectfully move for summary judgment as follows:

(1)      Reversing the Secretary's final administrative determination and directing the Secretary and his designated agents to reimburse the Plaintiffs for the bad debts they incurred as a result of services rendered to dually eligible Medicare beneficiaries that were paid under the Medicare Part B fee schedule; and

(2)      Awarding the Plaintiffs' interest on the unpaid Medicare reimbursement pursuant to 42 U.S.C. § 1395oo(f)(2), as well as their costs and disbursements.

This motion is made on the grounds that there are no issues of material fact in dispute and Plaintiffs are entitled to judgment as a matter of law and is supported by the accompanying Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment and Plaintiffs' Statement of Material Facts.  A proposed order setting forth the relief requested by this motion also is attached.

Respectfully submitted,


/s/  John R. Jacob_____
John R. Jacob
D.C. Bar No. 444412
AKIN GUMP STRAUSS HAUER & FELD LLP
Robert S. Strauss Building
1333 New Hampshire Avenue, NW
Washington, D.C. 20036
Telephone:  202-887-4582
Fax:  202-955-7648
Email:  jjacob@akingump.com


OF COUNSEL:
Daniel F. Miller
Barbara J. Janaszek
WHYTE HIRSCHBOECK DUDEK S.C.
555 E. Wells Street
Suite 1900
Milwaukee, WI 53202-3819
Telephone:  414-273-2100
Fax:  414-223-5000
Email:  dmiller@whdlaw.com
Email:  bjanaszek@whdlaw.com

Attorneys for Plaintiffs

Dated:  June 15, 2007

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ABINGTON CREST NURSING AND REHABILITATION CENTER, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 1:06-CV-01932 (RJL) |
| MICHAEL O. LEAVITT Secretary, United States Department of Health & Human Services, | ) ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# <u>TABLE OF CONTENTS</u>

Page

TABLE OF CONTENTS................................................................................................ i

TABLE OF AUTHORITIES ........................................................................................ ii

I.   INTRODUCTION ...............................................................................................1

II.  FACTUAL BACKGROUND..............................................................................1

III. PROCEDURAL HISTORY.................................................................................4

IV. ISSUE PRESENTED AND STANDARD OF REVIEW.......................................6

V.  ARGUMENT......................................................................................................8

     A.     Applicable Laws and Regulations Provide for Reimbursement
          of the Facilities' Uncollectible Deductibles and Coinsurance for
          Services Provided to Dual Eligibles, Including Services Payable
          under the Part B Fee Schedule; Nothing in the BBA of 1997
          Provides Otherwise…………………………………………………………..8

     B.     Analogous Federal Case Law Mandates that the Secretary's
          Decision Disallowing the Facilities' Part B Bad Debt Claims
          be Reversed........................................................................................14

     C.     The Secretary's Rationale for Disallowing the Facilities' Part B
          Bad Debt Claims is Flawed…………………………………………………16

          1.     Medicare's Prohibition Against Cross-Subsidization Applies
                    to Medicare Part B Payments, as well as Medicare Part A
                    Payments…………………………………………………………………16

          2.     Like the Prospective Payment System Methodology for
                    SNF Services Paid under Part A, the Fee Schedule
                    Methodology for Part B Services Reimburses Providers'
                    Costs and Pays a Pre-Determined Amount that Does Not
                      Account for Bad Debt…………………………………………………19

          3.     CMS' Purported "Policy" Not to Pay for Bad Debts Arising
                    from Any Services Paid under a Reasonable Charge or Fee
                      Schedule Methodology is Not Controlling………………………………22

VI. CONCLUSION..................................................................................................25

## TABLE OF AUTHORITIES

**CASES**

*Beazer East, Inc. v. United States E.P.A.*,
963 F.2d 603 ................................................................................................................16

*Christensen v. Harris County*,
529 U.S. 576 (2000) ......................................................................................................8

*\*GCI Health Care Ctrs., Inc. v. Thompson*,
209 F. Supp. 2d 63 (D.D.C. 2002) ...................................................................... Passim

*Maryland Gen. Hosp., Inc. v. Thompson*,
308 F.3d 340 (4th Cir. 2002) .........................................................................................7

*Mercy Med. Skilled Nursing Facility v. Thompson*,
No. C.A. 99-2765 TPJ, C.A. 01-2014; TPJ, C.A. 02-2252 TPJ, 2004 WL 3541332, *2
(D.D.C. May 14, 2004) (unpublished) ..........................................................................8

*Mt. Sinai Hosp. Med. Ctr. v. Shalala*,
196 F.3d 703 (7th Cir. 1999) .......................................................................................10

*Palisades Gen. Hosp. Inc. v. Leavitt*,
426 F.3d 400 (D.C. Cir. 2005) ...................................................................................7,8

*\*Shalala v. St. Paul-Ramsey Medical Center*,
50 F.3d 522 (8th Cir. 1995) ................................................................................... 15-16

*\*St. Luke's Methodist Hosp. v. Thompson*,
315 F.3d 984 (8th Cir. 2003) ........................................................................... 7, 14, 24

*Thomas Jefferson Univ. v. Shalala*,
512 U.S. 504 (1994) ......................................................................................................7

**STATUTES, RULES & REGULATIONS**

5 U.S.C. § 702 *et seq* ......................................................................................................1

*42 U.S.C. § 1395 *et. seq* ..........................................................................................1, 17

42 U.S.C. § 1395f(a) .......................................................................................................9

42 U.S.C. § 1395m(k) ....................................................................................................9

42 U.S.C. § 1395x .........................................................................................................17

*42 C.F.R. Chapter 413 ...................................................................................................6

42 C.F.R. § 413.1(g)(2)(ii).............................................................................................9

42 C.F.R. § 413.30.................................................................................................. 14-15

*42 C.F.R. § 413.5.........................................................................................................9

*42 C.F.R. § 413.80 ............................................................................................. Passim

*42 C.F.R. § 413.80(a)..................................................................................................12

*42 C.F.R. § 413.80(c)..................................................................................................23

*42 C.F.R. § 413.80(d) .................................................................................... 12, 18, 23

42 C.F.R. § 413.80(e)..............................................................................................12, 23

*42 C.F.R. § 413.80(h) .................................................................................................13

*42 C.F.R. § 413.80(i) ......................................................................................21, 22, 23

*42 C.F.R. § 413.89 ............................................................................................. Passim

*42 C.F.R. § 413.89(d) .................................................................................................18

42 C.F.R. Chapter 414. .................................................................................................6

42 C.F.R. § 414.1 *et seq.*..........................................................................................9, 21

42 C.F.R. § 483.45 ........................................................................................................8

*Balanced Budget Act of 1997, Pub. L. No. 105-33, 111 Stat. 251 (1997) ("BBA")........... Passim

Administrative Procedure Act, 5 U.S.C. § 706............................................................7

Deficit Reduction Act of 2005, Pub. L. No. 109-171, § 5004  ...................................13

§ 1861(b)(1)(A)(i) of the Social Security Act, 42 U.S.C. § 1395 x(v)(1)(A)........................ Passim

**MANUALS**

Skilled Nursing Facility Manual § 230.3(A) ...............................................................8

PRM § 300 ...............................................................................................................3, 19

PRM § 310 ...................................................................................................................19

PRM § 312 ..........................................................................................................3, 15, 19

PRM § 322 ..........................................................................................................3, 12, 19

PRM § 334 ....................................................................................................................19

PRM § 334.2 .................................................................................................................19

PRM § 2534 ..................................................................................................................14

PRM § 2534.5 ...............................................................................................................15

**OTHER AUTHORITIES**

68 Fed. Reg. 6682, 6683-87 (Feb. 10, 2003) ...............................................................14

69 Fed. Reg. 49,254 (Aug. 11, 2004)...........................................................................10

71 Fed. Reg. 6991 (Feb. 10, 2006) ..............................................................................13

71 Fed. Reg. 69,624, 69,785 (Dec. 1, 2006) ................................................................10

## I.     __INTRODUCTION__

This action arises under the Medicare Act, as amended, 42 U.S.C. § 1395 *et seq*., and is brought pursuant to the Administrative Procedure Act, as amended, 5 U.S.C. § 702 *et seq*.  Each of the 21 plaintiffs is a Medicare-certified skilled nursing facility ("SNF") owned and/or operated by Extendicare Health Services, Inc., (collectively, "Extendicare Facilities" or "Facilities").  The Extendicare Facilities seek review of a final administrative action of the Secretary of the United States Department of Health and Human Services, wherein the Secretary (acting through his designated agent, the Administrator of the Centers for Medicare & Medicaid Services ("CMS")), reversed the decision of the Provider Reimbursement Review Board ("PRRB" or "Board"), and disallowed some of the Facilities' bad debt claims submitted on their Medicare cost reports.  The disallowed bad debt claims related to uncollected coinsurance and deductibles for therapy services rendered that were payable under the Medicare Part B fee schedule during the Facilities' fiscal year ending December 31, 1999.  (AR 2-17.)[1]  The recipients of the services were patients who were eligible for both Medicare and Medical Assistance ("MA" or "Medicaid") at the time services were rendered.  (Id.)  Because the Facilities' claims for uncollected coinsurance and deductibles constituted allowable bad debts pursuant to applicable provisions of the Medicare program's governing law and regulations, the Secretary's decision should be reversed.

## II.     __FACTUAL BACKGROUND__

The Extendicare Facilities provide, *inter alia,* physical, occupational and speech therapy services ("therapy services") to residents who require such services, as determined by their physicians and required by their plans of care.  For some of the Facilities' residents who have

---

[1]  "AR" refers to the Administrative Record filed with the Court.

coverage provided by the Medicare program, these therapy services are reimbursed under Part B of the Medicare program.

Prior to the enactment of the Balanced Budget Act of 1997, Pub. L. No. 105-33, 111 Stat. 251 (1997) ("BBA"), the Extendicare Facilities obtained reimbursement for services provided to residents eligible for Medicare under a system that reimbursed them the lower of their charges or their reasonable costs. Under that system, the Extendicare Facilities submitted claims to United Government Services, LLC, Extendicare's national fiscal intermediary ("UGS" or "Intermediary"), which would then reimburse the Facilities for the lesser of their charges or their reasonable costs for services, less the applicable deductibles and coinsurance the Medicare program mandated be paid by the beneficiary. The Facilities would then seek payment for those deductibles and coinsurance from the residents.

The Medicare program has long recognized that some indigent residents qualify for both Medicare and Medicaid benefits. Such beneficiaries, who are referred to as "dually eligible" or "dual eligibles" have Medicare as their primary coverage for skilled nursing facility ("SNF") services, but their Medicare deductibles and coinsurance are sometimes paid by the Medicaid program operated by the states in which the beneficiaries reside. However, some state Medicaid Plans elect to not reimburse these costs at all, or place limits on the amount that the Medicaid program will reimburse, often only reimbursing up to the point that the provider receives an amount equal to the reimbursement available under the Medicaid program. As the Medicaid reimbursement is often less than the parallel Medicare reimbursement, it is frequently the case that the primary Medicare payment is equal to or greater than the Medicaid reimbursement, and the Medicaid program does not pay any sum toward the beneficiaries deductible or coinsurance amounts. See, e.g., *GCI Health Care Ctrs., Inc. v. Thompson*, 209 F.Supp. 2d 63, 66 (D.D.C.

2

2002).  Further, the MA programs of some states prohibit Medicare providers, including the

Extendicare Facilities, from seeking these payments from the individual beneficiaries who

qualify for Medical Assistance under their respective MA State Plans.[2]  As a result, with regard

to some dually eligible residents, the Extendicare Facilities could not collect the Medicare

program's mandated deductibles and coinsurance from either the MA program or the residents.

The Extendicare Facilities were permitted, however, to claim the uncollectible Medicare

deductibles and coinsurance for both Part A and Part B services attributable to dually eligible

residents as bad debts on their Medicare cost reports and obtain Medicare reimbursement.  (AR

238.)  The regulation at issue, § 42 C.F.R. § 413.80 (now codified at 42 C.F.R. § 413.89),

specifically provides that bad debts that are attributable to uncollected Medicare deductibles and

coinsurance amounts are reimbursable.  Similarly, the Provider Reimbursement Manual

("PRM") provides, in §§ 300, 312 and 322, that any portion of such deductible or coinsurance

amounts that a State MA program is not obligated to pay can be included as a bad debt on

providers' Medicare cost reports.  Thus, the Facilities claimed the unpaid deductibles and

coinsurance amounts for Part A and Part B services rendered to dually eligible beneficiaries on

their pre-FY 1999 Medicare cost reports, and UGS routinely reimbursed these claims without

controversy.  (AR 238.)  There is no dispute that unpaid deductibles and coinsurance arising

from Part B services rendered to SNF residents *were* subject to payment as bad debts.  *GCI

Health Care Ctrs., Inc.,* 209 F. Supp. 2d at 66.

However, beginning with cost reporting periods commencing after July 1, 1998,

Congress mandated that the Medicare program shift its reimbursement system for Part A covered

---

[2]  Twenty (20) of the twenty-one (21) Extendicare Facilities are located in the States of Pennsylvania or
Washington, and both of these states limit Medicare providers rights to collect deductibles and
coinsurance from their MA programs and from dually eligible state residents as well.

services SNFs render to a prospective payment system ("PPS").[3]  Along with the implementation

of PPS for SNF admissions covered by Medicare Part A, Congress provided that therapy services

SNFs provide would be reimbursed under the Medicare Part B fee schedule if the Medicare

eligible resident was not in a covered Part A stay at the time therapy services were rendered.

Under the new system for SNF services, the resident remains responsible for payment of

deductibles and coinsurance for both Part A and Part B services, just as before.  Thus, the

Extendicare Facilities continued to be unable to collect deductibles and coinsurance for therapy

services payable under the Part B schedule provided to dually eligible residents of states that

prohibit collection of deductibles and coinsurance from either the state's MA program or its

residents.  Extendicare reported the uncollectible deductibles and coinsurance related to both Part

A and Part B services as bad debts on the Facilities' 1999 Medicare cost reports.[4]  (Compl. ¶ 17,

Ans., ¶ 17.)

## III.  __PROCEDURAL HISTORY__

When UGS audited the Extendicare Facilities' 1999 Medicare cost reports, it disallowed

the bad debt claims for services rendered to dually eligible patients that were subject to payment

under the Medicare Part B fee schedule.  (AR 238.)  Each of the Facilities timely appealed to the

PRRB.  Although some of the Facilities raised additional issues at the time their individual

appeals were filed, these were administratively resolved by a letter dated September 19, 2002.

(AR 1028-1033.)  At that time, the Facilities also requested that they be permitted to pursue the

Part B bad debt issue as a group appeal.  (Id.)  The Board granted this request by letter dated

October 3, 2002.  (AR 299-304.)  Extendicare filed the necessary jurisdictional documents on

---

[3]   These changes were adopted as part of the BBA of 1997.

[4]   The parties have stipulated that the bad debt claims for services payable under the Part B fee schedule
totaled $131,231.00 for the 21 Extendicare Facilities.  (AR 134-138.)

October 23, 2002, and UGS agreed that there were no jurisdictional impediments to the Board's

review of the appeal.  (AR 298.)  Four other Extendicare Facilities withdrew their claims.  The

parties then stipulated to certain factual matters.  (AR 134-138).  The Stipulation further

provided that the Intermediary's *sole* basis for denying the claims for bad debt reimbursement

was its determination that unpaid coinsurance and deductibles of dually eligible residents for

services payable under the Medicare Part B fee schedule do not constitute bad debts.  Thus,

unlike the Medicare providers in *GCI Health Care Ctrs., Inc. v. Thompson*, there is no dispute

about the Extendicare Facilities collection efforts; the Intermediary has stipulated that they

submitted all documentation necessary to support their claims.  (AR 134-138.)

        The PRRB conducted a hearing on the appeal on February 3, 2005.  On July 21, 2006, the

PRRB issued its decision.  (AR 59-66.)  After consideration of Medicare law and guidelines, the

parties' contentions and the evidence contained in the record, the Board concluded that the

Intermediary's adjustments were improper.  (Id. at 59.)  The Board noted that § 1861(b)(1)(A)(i)

of the Social Security Act, 42 U.S.C. § 1395 x(v)(1)(A), articulates the principle against

cross-subsidization, which provides that the costs for individuals covered by Medicare must not

be borne by individuals not covered by the program, just as costs for individuals not covered by

the program must not be borne by Medicare, and that the Secretary, by regulation, had adopted

that policy and incorporated it in the bad debt regulation.  (AR 62.)  It further observed that,

while the BBA of 1997 shifted the basis of payment for SNF outpatient rehabilitation services

from cost-based to fee-based, it made no mention of related bad debt and there was no change to

42 C.F.R. § 413.80.  (Id.)  The PRRB reasoned that, if Congress had intended to eliminate Part B

bad debt reimbursement to SNFs, it would have done so in the statutes, as it had for other

Medicare providers, including physician assistants, durable medical equipment suppliers

("DME") and Certified Registered Nurse Anesthetists ("CRNA") services. (Id. at 63.) The

Board also noted that the then proposed rule CMS published in February 2003, which would

have amended 42 C.F.R. § 413.80 to eliminate bad debts claims arising from any service paid

under a fee schedule, was evidence that the "existent regulations allowed bad debts for some fee

based services." Id. Thus, the Board concluded:

> SNF debt policy was established by operation of regulation and,
> when Congress changed the statute, it gave no indication that
> regulations should be modified. Absent a change in that
> regulation, the Board majority cannot modify or eliminate its
> mandate and must conclude that 42 C.F.R. § 413.80 remains the
> controlling authority for the payment of bad debts.

(Id.)

One member of the Board dissented, noting that Medicare's bad debt reimbursement

policy is found in 42 C.F.R. Chapter 413, entitled "Principles of Reasonable Cost

Reimbursement," while, in contrast, there is no bad debt reimbursement policy in the chapter of

the regulations governing reimbursement determined under a fee schedule -- Chapter 414.

(AR 66.) She also observed that the Medicare program had never reimbursed bad debts

associated with fee schedule reimbursed services. (Id.)

The Intermediary requested review of the PRRB's decision. (AR 53-55.) The Center for

Medicare Management also submitted comments seeking review. (AR 49-52.) By letter dated

August 8, 2006, the Secretary notified the parties that the Board's decision would be reviewed.

(AR 47-48.) On September 12, 2006, the Secretary, following receipt of comments from the

Extendicare Facilities, issued a final administrative decision (AR 2-17), wherein he reversed the

PRRB's decision, concluding:

> Applying the law to the facts of this case, the Administrator finds
> that the Intermediary properly denied the Providers' claimed
> Medicare bad debts relating to uncollectible deductibles and

coinsurance arising from therapy services provided to patients who
are not in a covered Part A stay and for which payment was
determined in accordance with the Part B fee schedule.  The
Administrator finds that the BBA of 1997 changed the basis of
payments from reasonable cost to a fee schedule for these services.
Medicare's long standing policy has been not to pay for bad debts
for any services paid under a reasonable charge or fee schedule
methodology.

(AR 11.)

## IV.    ISSUE PRESENTED AND STANDARD OF REVIEW

The issue before the Court is whether the Secretary acted properly in reversing the

determination of the PRRB and holding that claims related to uncollectible deductibles and

coinsurance for services rendered to dually eligible Medicare beneficiaries that were paid under

the Medicare Part B fee schedule do not constitute reimbursable bad debts under applicable

Medicare law and regulations.

The District Court's review of the Secretary's decision is governed by the Administrative

Procedure Act, 5 U.S.C. § 706, which provides that the Agency's decision may be overturned

only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the

law." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994); *Palisades Gen. Hosp. Inc.

v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005).  When the question is whether an agency has

properly interpreted and applied its own regulation, the reviewing court must give the Agency's

interpretation "substantial deference."  *Thomas Jefferson Univ.,* 512 U.S. at 512.  However,

"[d]eference . . . does not mean blind obedience," and no deference is due if the Agency's

interpretation is 'plainly erroneous or inconsistent with the regulation'."  *Maryland Gen. Hosp.,

Inc. v. Thompson*, 308 F.3d 340, 343 (4th Cir. 2002) (citations omitted).

Where a regulation is plain on its face, the court will give no deference to an Agency's

attempt to interpret such regulation.  *St. Luke's Methodist Hosp. v. Thompson*, 315 F.3d 984, 987

(8th Cir. 2003), citing *Christensen v. Harris County*, 529 U.S. 576, 588 (2000). And, where a

court reviewing an Agency action determines that the Agency made an error of law, the case

must be remanded to the Agency for further action consistent with the correct legal standards.

*Palisades Gen. Hosp.*, 426 F.3d at 403. Further, where the Secretary's interpretation of its own

regulation "constitutes a change in the Secretary's definitive interpretation made without

following the required notice-and-comment procedures," it violates the Administrative Procedure

Act." *Mercy Med. Skilled Nursing Facility v. Thompson*, No. C.A. 99-2765 TPJ, C.A. 01-2014

TPJ, C.A. 02-2252 TPJ, 2004 WL 3541332, *2 (D.D.C. May 14, 2004) (unpublished).

## V.    ARGUMENT

### A.    Applicable Laws and Regulations Provide for Reimbursement of the Facilities' Uncollectible Deductibles and Coinsurance for Services Provided to Dual Eligibles, Including Services Payable under the Part B Fee Schedule; Nothing in the BBA of 1997 Provides Otherwise.

Therapy services a SNF renders are covered services under the Medicare program where

they: 1) are ordered by a physician; 2) require the skills of technical or professional personnel

such as physical or occupational therapists, or speech pathologists; and 3) are furnished directly

by, or under the supervision of, such personnel. See (Skilled Nursing Facility Manual,

§ 230.3(A)). Moreover, to be covered, the therapy services must relate directly and specifically

to a written treatment plan established by a physician and be reasonable and necessary to the

treatment of the beneficiary's illness or injury. (Id.)

Consistent with Medicare standards, the Extendicare Facilities provide a full range of

covered therapy services to residents who require them, including physical, speech and

occupational therapy. See 42 C.F.R. § 483.45. These therapy services may continue to be

necessary for a resident beyond the point in time their stay at the SNF is covered by Part A of

Medicare. In that case, these post-Part A services are billable to Medicare Part B. Prior to fiscal

8

year 1999, the Facilities submitted a claim for the costs of its Part B therapy services to Medicare for each service provided during the fiscal year.  The Medicare program would, in turn, reimburse the Facilities for therapy services as an ancillary cost under the lesser of reasonable cost or charge payment system.  This reimbursement decision would result in a payment by Medicare for the lower of the charges for the service or the reasonable cost, less the annual deductible for each resident if not previously fulfilled and a coinsurance of 20% of the amount that was also the resident's responsibility.

The BBA adopted the Medicare Part B fee schedule as the payment system for therapy services SNFs provide to Medicare beneficiaries that are not in a covered Part A stay.  See 42 U.S.C. § 1395m(k); 42 C.F.R. § 413.1(g)(2)(ii).  Under the new payment system, Congress mandated that an annual deductible and 20% coinsurance that had previously been applied to Part B covered services continue to be required of the individuals who receive the services, although the amount of the coinsurance would now be determined in accordance with the Part B fee schedule.  Id.; 42 C.F.R. § 414.1 et seq.

Under the Medicare program, providers are to be reimbursed for their operational "reasonable costs" in providing care to Medicare patients.  See 42 U.S.C. § 1395(f)(a); 42 U.S.C. § 1395x(v)(1)(A); 42 C.F.R. § 413.5.  The reason lost revenues are considered bad debts and are reimbursable by the Medicare program is that the failure to collect these sums from Medicare will inevitably result in persons or entities other than the Medicare program or its beneficiaries paying part of the costs of providing services to Medicare beneficiaries.  See 42 C.F.R. § 413.80. To ensure that these costs of services to Medicare beneficiaries are not shifted away from the federal health care programs and its beneficiaries and onto other insurance carriers or self-paying residents, the Medicare program provides that uncollectible deductibles and coinsurance for

services rendered to Medicare patients are to be reported as bad debts on Providers' annual

Medicare cost reports.  Id.; *Mt. Sinai Hosp. Med. Ctr. v. Shalala*, 196 F.3d 703, 706 (7th Cir.

1999).

For the time period relevant to this case (1999), 42 C.F.R. § 413.80 provides, in pertinent

part:[5]

> (a)  *Principle*.  Bad debts, charity, and courtesy allowances are
> deductions from revenue and are not to be included in allowable
> cost; however, except for anesthetists' services described under
> paragraph (h) [sic] of this section, bad debts attributable to the
> deductibles and coinsurance amounts are reimbursable under the
> program.
>
> (b)  *Definitions*—(1)  *Bad debts*.  Bad debts are amounts
> considered to be uncollectible from accounts and notes receivable
> that were created or acquired in providing services.  "Accounts
> receivable" and "notes receivable" are designations for claims
> arising from the furnishing of services, and are collectible in
> money in the relatively near future.
>
> \*   \*   \*
>
> (c)  *Normal Accounting Treatment:  Reduction in revenue*.  Bad
> debts, charity and courtesy allowance represent reductions in
> revenue.  The failure to collect charges for services furnished does
> not add to the cost of providing the services.  Such costs have
> already been incurred in the production of the services.

---

5    The regulation was subsequently renumbered as 42 C.F.R. § 413.89.  69 Fed. Reg. 49,254 (Aug. 11,
2004).  In addition, effective on January 1, 2007, 42 C.F.R. § 413.89 was revised to read, in pertinent
part, as follows:

   Bad debts, charity, and courtesy allowances.

   (a) Principle. Bad debts, charity, and courtesy allowances are deductions from revenue
   and are not to be included in allowable cost.  However, subject to the limitations
   described under paragraph (h) of this section and the exception for services described
   under paragraph (i) of this section, bad debts attributable to the deductibles and
   coinsurance amounts are reimbursable under the program.

   \*   \*   \*

   (i) Exception. Bad debts arising from covered services paid under a reasonable charge-
   based methodology or a fee schedule are not reimbursable under the program.

71 Fed. Reg. 69,624, 69,785 (Dec. 1, 2006).

(d)  *Requirements for Medicare.*  Under Medicare, costs of covered services furnished beneficiaries are not to be borne by individuals not covered by the Medicare program, and conversely, costs of services provided for other than beneficiaries are not to be borne by the Medicare program.  Uncollected revenue related to services furnished to beneficiaries of the program generally means the provider has not recovered the cost of services covered by that revenue.  The failure of beneficiaries to pay the deductible and coinsurance amounts could result in the related costs of covered services being borne by other than Medicare beneficiaries.  To assure that such covered service costs are not borne by others, the costs attributable to the deductible and coinsurance amounts that remain unpaid are added to the Medicare share of allowable costs.  Bad debts arising from other sources are not allowable costs.

(e) *Criteria for allowable bad debt.*  A bad debt must meet the following criteria to be allowable:  (1) The debt must be related to covered services and derived from deductible and coinsurance amounts. (2) The provider must be able to establish that reasonable collection efforts were made.  (3) The debt was actually uncollectible when claimed as worthless.  (4)  Sound business judgment established that there was no likelihood of recovery at any time in the future.

*        *        *

(h) *Limitations on bad debts.*  In determining reasonable costs for hospitals, the amount of bad debts otherwise treated as allowable costs (as defined in paragraph (e) of this section) is reduced – (1) For cost reporting periods beginning during fiscal year 1998, by 25 percent; (2) For cost reporting periods beginning during fiscal year 1999, by 40 percent; and (3) For cost reporting periods beginning during fiscal year 2000, by 45 percent.  (4)  For cost reporting periods beginning during a subsequent fiscal year, by 30 percent.

(i) *Exception.*  Bad debts arising from services for anesthetists paid under a fee schedule are not reimbursed under the program.

As noted *supra* at 2, for dually eligible Medicare/Medicaid recipients, the collection of

deductible or coinsurance amounts from Medicaid programs in some states is statutorily limited

or prohibited.  Thus, for services rendered subsequent to January 1, 1999, Extendicare has been

unable to collect some of these Medicare program revenues, just as had been the case prior to the

11

adoption of PPS and the Part B fee schedule as the payment systems for services SNF's render to Medicare beneficiaries.

It is undisputed that the Intermediary did not disallow the Extendicare Facilities' bad debt claims because of any failure on the part of the Extendicare Facilities to meet the criteria set forth in 42 C.F.R. § 413.80(e), including adequacy of their collection efforts.  (AR 1028-1033.)[6]

In addition, it is critical to note that the focus of the governing regulation is on the providers' lost revenue arising from services rendered to Medicare beneficiaries due to the inability to collect deductibles and coinsurance.  These amounts represent a significant portion of providers' overall reimbursement for services rendered under the Medicare program.  42 C.F.R. § 413.80(a).  Specifically, "*Uncollected revenue* related to services furnished to beneficiaries of the program generally means the provider *has not recovered the cost of services* covered by that revenue."  42 C.F.R. § 413.80(d) (emphasis added).

Thus, the governing regulation specifically provides that it is the provider's loss of revenue associated with Medicare patients that drives the determination of whether the amount is reimbursable as an allowable bad debt.  There is no question that the Facilities' uncollectible coinsurance and deductibles for therapy services rendered to dually eligible beneficiaries constitute lost revenue directly attributable to treating Medicare patients.  Moreover, no portion of 42 C.F.R. § 413.80, as it existed during the Facilities' 1999 fiscal year, distinguishes between

---

[6]    In his decision, the Secretary notes, "Even assuming, *arguendo*, that such bad debts were found to be allowable, the Provider would still be required to demonstrate that, "inter alia", Medicare was responsible for the bad debts of the QMBs under § 322 o the PRM and that the requirements of 42 C.F.R. 413.80(e) were otherwise met."  (Admin. Dec. at 15, AR 16.)  However, as previously noted, it is undisputed that the Facilities met all of the requirements of 42 C.F.R. 413.80(e) and §§ 312 and 322 of the PRM, as evidenced by the stipulation the parties executed and submitted to the PRRB.

reimbursement of bad debts to the uncollectible Medicare deductibles and coinsurance arising from fee schedules and those arising from any other type of payment system.

The Secretary's disallowance of these claims disregards the plain terms of the regulation, and it is also contrary to Congress' action regarding bad debt reimbursement for SNF services. Surely, Congress would have explicitly limited bad debt reimbursement when it adopted the prospective payment and Part B fee schedule system for SNFs if it had intended to do so.  In fact, Congress did impose limits on hospital bad debt reimbursement in the very same legislation (BBA)[7], but it did not impose any similar limitation on SNFs.  And, more recently, in the Deficit Reduction Act of 2005, Congress amended the Medicare Act to limit SNFs' bad debt reimbursement arising from individuals entitled to benefits under Medicare Part A, but it *specifically exempted* dually eligible beneficiaries from this bad debt limitation.  Deficit Reduction Act of 2005 ("DRA"), Pub. L. No. 109-171, § 5004, 120 Stat. 4, 32.[8]  See 71 Fed. Reg. 6991 (Feb. 10, 2006).  This is the same population of Medicare beneficiaries that the Secretary "interpreted" out of the provisions of 42 C.F.R. § 413.80 six years earlier, yet Congress has explicitly exempted them from the limitation it imposed on SNF bad debt in the DRA of 2005.

Thus, the Secretary's interpretation of the BBA of 1997, to the effect that a SNF's Medicare Part B bad debts would no longer be subject to reimbursement, lacks any legislative mandate or support.

---

[7]  The hospital bad debt limitation Congress imposed was subsequently added to the regulation as 42 C.F.R. § 413.80(h).

[8]  The congressional enactment limiting certain bad debt reimbursement claims by SNFs is effective for cost reporting periods beginning on or after October 1, 2005 and, therefore, does not limit the Facilities' rights to reimbursement in this case.

Moreover, the Secretary has applied this interpretation long before commencement of notice and comment rule-making procedures in accordance with the Administrative Procedures Act.  The Secretary did not begin the rule-making process until February 2003 -- many years after the completion of the Facilities' 1999 Medicare costs years that are involved in this case. See 68 Fed. Reg. 6682, 6683-87 (Feb. 10, 2003).

For these reasons, the Extendicare Facilities properly submitted an accounting of bad debts for the fiscal year ending December 31, 1999, that included the uncollectible Medicare deductibles and coinsurance arising from therapy services provided to dually eligible beneficiaries that were payable under the Medicare Part B fee schedule, and the Secretary's decision disallowing these claims must be reversed.

### B.    Analogous Federal Case Law Mandates that the Secretary's Decision Disallowing the Facilities' Part B Bad Debt Claims be Reversed.

The Secretary's interpretation of the applicable regulations can only be construed as an attempt to add a restriction to the regulation that does not exist; it is also a departure from the long held position that bad debts arising from services subject to payment under Medicare Part B were subject to reimbursement on the Medicare cost reports of skilled nursing facilities.  See, e.g., *GCI Health Care Ctrs., Inc.,* 209 F. Supp. 2d at 66.  In similar circumstances, other federal courts have rejected such attempts to impose additional restrictions on validly promulgated regulations, and this Court should do so as well.  See, e.g., *St. Luke's Methodist Hosp. v. Thompson*, 182 F. Supp. 2d 765, 780-783 (N.D. Iowa 2001), *aff'd* 315 F. 3d 984 (8th Cir. 2003).

In *St. Luke's*, the Intermediary and CMS had interpreted a provision of the PRM § 2534, as prohibiting Medicare providers from recovering costs of providing services to Medicare beneficiaries pursuant to 42 C.F.R. § 413.30, which allows hospital-based skilled nursing facilities to recover costs in excess of the reasonable costs limits provided that certain conditions

14

are met.  The Intermediary and CMS had applied a newly-minted section of the PRM, § 2534.5, to supplement the requirements set forth in the governing regulation, 42 C.F.R. § 413.30.  Both the district court and the court of appeals concluded that this "interpretive" provision of the PRM could not be used to disallow Medicare providers' RCL exception requests, which fully complied with the governing regulation.  The courts noted that the PRM provision was not subject to notice and comment rulemaking, which would be required before a substantive change in the reimbursement criteria could be adopted.

In the instant case, there was no change in the statute or in the governing regulation that supports the Secretary's notion that bad debts for SNF services payable under the Medicare Part B fee schedule were no longer subject to reimbursement.  Indeed, in this instance, the Secretary cannot even point to a provision of the PRM to support its contention that the Facilities' Part B bad debt claims do not meet the criteria set forth in 42 C.F.R. § 413.80.  As such, the governing law and regulations do not support the Secretary's reversal of the PRRB decision.

Similarly, in *Shalala v. St. Paul-Ramsey Medical Center*, 50 F.3d 522 (8th Cir. 1995), the federal court of appeals struck down an attempt by the Intermediary and CMS to impose a limitation on Medicare reimbursement that was not set forth in the governing regulation.  Id. at 529.  The decision in *St. Paul-Ramsey* centered upon a hospital's claim for bad debt reimbursement under 42 C.F.R. § 413.80.  CMS and the Intermediary attempted to apply § 312 of the PRM so as to add an additional requirement to the criteria set forth in the regulation, which, as previously noted, was adopted pursuant to notice and comment rule making.  The court, which applied a deferential standard of review, rejected CMS's attempt to apply a PRM

requirement that the hospital must independently determine the patient's indigence before

claiming a bad debt expense. The court concluded:

> We agree with the Third Circuit that while the "plainly erroneous"
> standard should be applied to the agency's interpretation where the
> meaning of the agency rule or regulation is ambiguous or in doubt,
> "we are not at liberty to allow the agency to imply language that
> does not exist in the regulation."

*St. Paul-Ramsey*, 50 F.3d at 529, citing *Beazer East, Inc. v. United States E.P.A.*, 963 F.2d 603,

607 (3rd Cir. 1992).

As was true in *St. Paul-Ramsey*, the Secretary cannot point to any language in the statute,

regulations or PRM to support his contention that Medicare providers are not eligible to recover

unpaid coinsurance and deductibles for services rendered during the fiscal year ending

December 31, 1999 that were payable under the Part B fee schedule. In fact, the applicable

provisions of 42 C.F.R. § 413.80 allow the Extendicare Facilities to claim these expenses on

their Medicare cost reports, because all of the regulation's criteria are met. Thus, the Secretary's

attempt to impose a limitation that does not appear in the governing statute, regulations or

relevant manual provisions should be reversed.

**C.    The Secretary's Rationale for Disallowing the Facilities' Part B Bad Debt Claims is Flawed.**

**1.    Medicare's Prohibition Against Cross-Subsidization Applies to Medicare Part B Payments, as well as Medicare Part A Payments.**

In his decision, the Secretary repeatedly asserts that Medicare's prohibition against cross-

subsidization does not apply to the Part B side of the Medicare program, and suggests that this

has been true from Medicare's inception. For example, the Secretary asserts,

> In contrast to Medicare Part A payments, for Medicare Part B
> payments, the original statutory provisions establish the principles
> of reasonable charge payments for physician services and other
> services under Part B . . . As Medicare Part B payments were not
> based on reasonable costs, but rather were based on reasonable

16

charges or a fee schedule, notably there was no corresponding
prohibition against cross-subsidization under the Part B reasonable
charge or fee schedule methodologies.  Plainly, the Part B
reasonable charge and fee schedule payment methodologies were
not controlled by the provisions of § 1861(v)(1)(A) of the Act.

(Admin. Dec. at 7, AR 8.)  The Secretary also asserts that "[t]he bad debt provision arises from

the reasonable 'cost' anti-cross-subsidization provisions which is not controlling under the

reasonable charge/fee schedule methodologies set forth at § 1848 of the Act."  (Admin. Dec. at

11, AR 12.)  To the extent that the Secretary maintains that reimbursable uncollectible

deductibles and coinsurance arising from services provided under Part B do not constitute bad

debt because Medicare's anti-cross-subsidization provisions do not apply to Part B payments, the

Secretary's position contradicts his long-standing interpretation of 42 U.S.C. § 1395x(v)(1)(A).

        As the Secretary notes, the anti-cross-subsidization principle is articulated in

§ 1861(v)(1)(A) of the Act, codified at 42 U.S.C. § 1395x(v)(1)(A).  Nothing in that section

indicates that the anti-cross-subsidization language applies only to Part A.  Moreover,

42 U.S.C. § 1395x(v)(1)(A), which addresses the matter of "reasonable costs," is a definitional

section.  Like other definitions included in § 1395x, it applies "for purposes of this title,

[42 U.S.C. XVIII §§ 1395 *et. seq.*]," i.e., Title XVIII (Health Insurance for the Aged and

Disabled;) -- a title that encompasses Part B as well as Part A.  42 U.S.C. § 1395x (Introduction),

Social Security Act §§ 1801-1896.  Clearly, § 1395x(v)(1)(A) applies to Part B as well as Part A.

It also makes clear that methodologies for fixing the "reasonable costs" of services may include

reasonable charge-based methods -- as long as they reflect reasonable costs.  42 U.S.C.

§ 1395x(v)(1)(A) (providing that "reasonable cost of any services . . . shall be determined in

accordance with regulations establishing the method or methods to be used, and the items to be

17

included, in determining such costs" and that such methods may provide "for the use of charges or a percentage of charges where this method reasonably reflects the costs.")

In addition, the Secretary's attempt to interpret the cross subsidization prohibition as applying only to Part A services ignores the fact that it is *imbedded* in the governing regulation, 42 C.F.R. § 413.89, which the Secretary adopted in accordance with the Administrative Procedure Act and which applies to *both* Part A and Part B services.  See 42 C.F.R. § 413.80(d).[9] *GCI Health Care Ctrs.*, *Inc*. 209 F. Supp. 2d at 66.

Moreover, the PRM specifically also recognizes that the anti-cross-subsidization principle applies equally to Part A and Part B of the Program:

> 300. PRINCIPLE
> Bad debts, charity and courtesy allowances are deductions from revenue and are not to be included in allowable costs; however, bad debts attributable to the deductibles and coinsurance amounts are reimbursable under the Program.
>
> *     *     *
>
> 304. BAD DEBTS UNDER MEDICARE
> Bad debts resulting from deductible and coinsurance amounts which are uncollectible from beneficiaries are not includable as such in the provider's allowable costs; however, unrecovered costs attributable to such bad debts are considered in the Program's calculation of reimbursement to the provider.
>
> The allowance of unrecovered costs attributable to such bad debts in the calculation of reimbursement by the Program results from the expressed intent of Congress that the costs of services covered by the Program will not be borne by individuals not covered, and the costs of services not covered by the Program will not be borne by the Program. . . . [T]he inability of the provider to collect deductibles and coinsurance amounts from beneficiaries of the Program could result in part of the costs of covered services being

---

[9]     The regulation also does not differentiate among various payment methodologies the Secretary may employ as meaningful in the determination of whether a provider can be reimbursed for bad debt arising from services rendered to Medicare beneficiaries.  The focus is on uncollected revenue, which according to the regulation generally means that the Provider has not recovered its costs of services. 42 C.F.R. § 413.89(d).

borne by others who are not beneficiaries of the Program. Therefore, to assure that costs of covered services are not borne by others because Medicare beneficiaries do not pay their deductibles and coinsurance amounts, the Medicare program will reimburse the provider for allowable bad debts, not to exceed the total amount of unrecovered costs of covered services furnished to all beneficiaries. *In the determination of unrecovered costs due to bad debts, the Medicare program is considered as a whole without distinction between Part A and Part B of the Program.*

(emphasis added); see also PRM § 322, Medicare Bad Debts Under State Welfare Programs

("Any portion of such deductible or coinsurance amounts that the state is not obligated to pay

can be included as bad debt under Medicare, provided that the requirements of § 312 or, if

applicable, § 310 are met."); PRM § 334.2, Computation Under Part B; *GCI Health Care Ctrs.,*

*Inc.,* 209 F. Supp. 2d at 67, citing PRM § 300 (SNF's Part B "deductibles and coinsurance

amounts are reimbursable under the Program.").

Indeed, in reviewing PRM § 334, it is apparent that the Secretary requires Medicare

providers to offset Part B reimbursements that are in excess of costs against its Part A bad debt

claims. The only rational justification for this is the assumption that the cross subsidization

prohibition applies to both Parts A and B of the Medicaid program.

In light of the language of the Code and the explicit provisions of the PRM, there can be

little question that Congress intended that the anti-cross-subsidization principle apply to the SNF

services paid under both Part A and Part B, and that the Secretary understood this to be the case.

Accordingly, given the fact that, when Congress enacted the BBA, it did not limit bad debt

reimbursement with respect to payments under the Part B fee schedule for SNFs, there is no

basis for denial of the claims here involved. To the contrary, the Secretary's decision reversing

the Board on the grounds that Medicare's anti-subsidization policy is inapplicable to payments

made to SNFs under Part B of the program constitutes a change in the Secretary's definitive

interpretation and application of 42 U.S.C. § 1395x(v)(1)(A) and, as such, must be set aside.

> **2.     Like the Prospective Payment System Methodology for SNF Services Paid under Part A, the Fee Schedule Methodology for Part B Services Reimburses Providers' Costs and Pays a Pre-Determined Amount that Does Not Account for Bad Debt.**

In concluding that the Intermediary properly denied the Facilities' claimed Medicare bad

debts, the Secretary asserts that a fee schedule "does not involve costs;" rather, "Medicare makes

payment for a specific service for which there is a determined rate which includes a margin for

profit and which reflects the price of doing business." (Admin. Dec. at 11, AR 12.) The

Secretary notes that Congress did not specifically prohibit payment of bad debts under § 1848 of

the Act, 42 U.S.C. § 1395w-4, payment for physicians' services, which was "derived from a

reasonable charge methodology that is assumed to account for bad debts." (Admin. Dec. at 12;

AR 13.) He also observes that, while the CMS continued to pay bad debts after hospital

payments moved to prospective payment basis, it did so because bad debts incurred during the

base period were not included in the calculation of the prospective rates. (Id.)

In essence, it is the Secretary's position that the payment system methodology employed

under Part A of the Medicare program is somehow fundamentally different from the fee schedule

methodology applied to SNF services under Part B of the Medicare program, and that this

difference justifies a difference in treatment with respect to payment of bad debts arising from

uncollectible deductibles and coinsurance. However, the distinctions which the Secretary seeks

to draw between the prospective payment system methodology under Part A and the fee schedule

methodology under Part B are distinctions without meaning. In fact, the fee schedule

methodology is essentially a variation of the prospective payment system methodology for

inpatient services: both involve payment of a pre-determined amount that does not reflect the

actual costs incurred by a particular provider in delivering the service.  Nonetheless, in each case, the basis for the determination of the payment is cost-based and, in fact, it is firmly entrenched in cost data; and, neither methodology accounts for bad debt.

Under the statute creating the prospective payment system, the Secretary is required to determine payment schedules that are fundamentally derived from cost data.  See 42 U.S.C. § 1395w-4; 42 C.F.R. § 414.1 et seq.  Thus, both systems are cost-based, although they use an analysis of cost information provided previously to determine payment rates/fees prospectively. Id.  The Secretary essentially concedes as much.  (Admin. Dec. at 8, AR 9, noting that "practice expense RVUs [for physician services] were computed by applying historical practice costs percentages to a base allowed charge for each service.")  See 56 Fed. Reg. 59,510 (Nov. 25, 1991)  ("Consistent with § 1848(c)(2)(C) of the Act, we are computing practice expense and malpractice RVUs by applying historical practice cost percentages to a base allowed charge for each service.  That is, for each service, we multiple the 1991 average allowed charge by the historical practice expense percentage that was determined as a weighted average of the practice expense shares for the specialty performed in the service as reflected in the Medicare charge data.").

Moreover, contrary to the Secretary's suggestion, review of legislative and regulatory history reveals no support the proposition that either the reasonable charge, or the fee schedule methodology, accounts for bad debt.  Indeed, the only purported support the Secretary can muster for his sweeping pronouncement that bad debts are not reimbursable where payment is made pursuant to a fee schedule are references to bad debt prohibitions in statutes or in regulations adopted through mandatory notice and comment procedures that address specific types of medical services not involved here.  For example, 42 C.F.R. § 413.80(i) is a clear

pronouncement that bad debts arising from anesthetists' services paid under a fee schedule are not reimbursable.  The Secretary has not enacted such a limitation on  SNF services.

Contrary to the Secretary's suggestion, the fact that the Secretary has formally adopted regulations prohibiting payment of bad debts with respect to specific medical services for which payment is made under a fee schedule does not support the proposition that, even in the absence of a statutory provision or a properly promulgated regulation expressly barring the payment of bad debts SNF's incur where payment is based on the Part B fee schedule, the mere implementation of a fee schedule methodology means bad debts are accounted for and may not be reimbursed.  The Secretary's suggestion to the contrary is a non-sequitur.

In fact, the only conclusion that can be drawn from the Part B fee schedule methodology that was initially established to govern physician payments is that it does *not* account for bad debts.  See 42 U.S.C. § 1395w-4 (the components taken into account when setting the physician's fee schedule are the physician's work, *i.e.,* the time and intensity of effort involved; practice expense or overhead, such as rent, staff salaries, equipment and supplies (except malpractice insurance); and professional liability insurance or malpractice costs).

Moreover, in seeking to distinguish the particular bad debt claims here involved on the basis that a Part B fee schedule is not based on a provider's costs, the Secretary disregards the fact that the governing regulation permits the Facilities to claim these deductions from revenue as bad debt on their Medicare cost reports.  The regulation provides that the *only* exception for bad debts payable under a fee schedule that are not subject to reimbursement are those of anesthetists.  42 C.F.R. § 413.80(i).

3.     **CMS' Purported "Policy" Not to Pay for Bad Debts Arising from Any Services Paid under a Reasonable Charge or Fee Schedule Methodology is Not Controlling.**

In reaching his decision, the Secretary relies heavily on the assertion that it has been CMS' long-standing policy not to allow payment of bad debts for services paid on the basis of a fee schedule, and alleges that this "policy" derives from the fact that the anti-cross-subsidization principle is found in the "reasonable costs" definition section -- § 1861(v)(1)(A) of the Act and that fee schedules are not cost based.  However, such "policy," to the extent it can legitimately be found to exist prior to the Secretary's January 2007 adoption of revisions to 42 C.F.R. § 413.89, is not controlling, as it is facially inconsistent with the regulation governing the Extendicare Facilities' claims.  As noted, the regulation provides that the only exception for bad debts payable under a fee schedule that are not subject to reimbursement are those of anesthetists.  42 C.F.R. § 413.80(i).  Further, the notion that there has been a long-standing CMS policy of not allowing bad debt claims based upon coinsurance and deductibles for services payable under a fee schedule also is contradicted by 42 C.F.R. § 413.80(c), (d) and (e).  From a review of the regulation's language, *supra* at 10, it is evident that the Facilities have the right to claim bad debt reimbursement if they have lost revenue related to services provided to Medicare beneficiaries. The focus is on lost revenue traceable to services rendered to Medicare beneficiaries.  The type of payment structure that Medicare may have in place is irrelevant.

There is simply no language in the regulation that supports the distinction made by the Secretary.  Clearly, if CMS wants to distinguish bad debt claims based upon the type of payment system that has been adopted, this can only be done through statutory authority or regulations adopted in full compliance with the Administrative Procedure Act.  Although prior to January

2007, Congress had expressly limited bad debt reimbursement for particular types of providers when implementing alternative payment structures, no such limitation had been enacted with respect to SNFs providing services payable under the Part B fee schedule.  Moreover, although the governing regulation was amended to limit bad debt reimbursement to anesthetists paid under a fee schedule, prior to January 2007, there was no such regulatory action that would support disallowing the bad debt claims of SNFs that are at issue in this case.  Indeed, if the Secretary's disallowance of these bad debt claims is allowed to stand, the Facilities will effectively be denied payment of costs of providing services to Medicare beneficiaries, which is prohibited under the Medicare Act.  42 U.S.C. § 1395x(v)(1)(A); 42 C.R. R. § 413.80.  Moreover, as analogous federal decisions have made clear, CMS policy does not and cannot take precedence over the plain language of the governing regulation.  *St. Luke's Methodist Hosp.,* 315 F.3d 984.

Indeed, if the CMS and the Secretary believed that CMS' purported "policy" of not paying for bad debts for services paid under a reasonable charge or fee schedule methodology was determinative of the issue notwithstanding that said "policy" contradicted the language in 42 C.F.R. § 413.89, there would have been no need to adopt the recent amendment to the governing regulation that specifically excepts from reimbursement bad debts arising under a reasonable charge-based methodology or fee schedule.  Contrary to the Secretary's suggestion, notwithstanding the Agency's comments to the contrary, it does not have the authority to adopt exceptions to federal regulations simply by voicing a purported "policy" to that effect.  Policy cannot trump a validly promulgated regulation.

In rejecting the Facilities' position that it would have been unnecessary for the Secretary to adopt a regulation specifically prohibiting reimbursement of bad debts for services paid on the basis of a reasonable charge or fee schedule methodology if the Agency's "policy" were

controlling, the Secretary noted that, when the amendments were proposed in 2003, he explained

in the preface and comments that it has been Medicare's policy not to reimburse for such bad

debts.  The Facilities submit, however, that such self-serving comments do not substantiate the

broadly-worded "policy" articulated therein.  As is apparent from the comments, the only

support that the Secretary can offer for his contention that Medicare has never allowed payment

for bad debts or services paid on a fee schedule or reasonable charge methodology is references

to providers who were specifically denied reimbursement of bad debts by statute or properly-

adopted regulation -- "physicians, suppliers, Certified Registered Nurse Anesthetists, or NPs."

While the Secretary's adoption of regulations specifically prohibiting bad debt payments for

identified specified providers indicates that he has a policy of not reimbursing the bad debts of

those providers, it does not support the contention that, even in the absence of such statute or

regulation, it is the Secretary's policy to deny bad debt reimbursement to *all* providers being paid

for services under a charge-based or fee schedule methodology.  Indeed, the adoption of

regulations directed at specific providers confirms only that, until the Secretary formally adopted

the amendment to 42 U.S.C. § 413.89, SNFs were entitled to reimbursement of uncollectible Part

B coinsurance and deductibles as bad debts pursuant to that section.

## VI.     <u>CONCLUSION</u>

For all of the foregoing reasons, the Extendicare Facilities respectfully request that the

Court reverse the Secretary's decision and hold, consistent with the decision of the Board, that,

the Facilities were entitled to reimbursement of bad debts arising from therapy services rendered

to dually eligible Medicare/Medicaid beneficiaries that were paid under the Part B fee schedule.

Respectfully submitted,


/s/  John R. Jacob_____

John R. Jacob
D.C. Bar No. 444412
AKIN GUMP STRAUSS HAUER & FELD LLP
Robert S. Strauss Building
1333 New Hampshire Avenue, NW
Washington, D.C. 20036
Telephone:  202-887-4582
Fax:  202-955-7648
Email:  jjacob@akingump.com

OF COUNSEL:
Daniel F. Miller
Barbara J. Janaszek
WHYTE HIRSCHBOECK DUDEK S.C.
555 E. Wells Street, Suite 1900
Milwaukee, WI 53202-3819
Telephone:  414-273-2100
Fax:  414-223-5000
Email:  dmiller@whdlaw.com
Email:  bjanaszek@whdlaw.com

Attorneys for Plaintiffs


Dated:  June 15, 2007

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ABINGTON CREST NURSING AND ) | |
| REHABILITATION CENTER, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| v.  ) | Civil Action No. 1:06-CV-01932 (RJL) |
| ) | |
| MICHAEL O. LEAVITT ) | |
| Secretary, United States Department of Health ) | |
| & Human Services, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## PLAINTIFFS' STATEMENT OF MATERIAL FACTS

**Medicare Background**

1.      The Medicare program was established to provide health insurance to the aged

and disabled.  42 U.S.C. §§ 1395-1395cc.  The Centers for Medicare & Medicaid Services

("CMS"), formerly the Health Care Financing Administration ("HCFA"), is the operating

component of the Department of Health and Human Services ("DHHS") charged with

administering the Medicare Program.  CMS' payment and audit functions under the Medicare

program are contracted out to insurance companies known as Fiscal Intermediaries.  Fiscal

Intermediaries determine payment amounts due the providers under Medicare law and under

interpretive guidelines published by CMS.  See 42 U.S.C. § 1395(h), 42 C.F.R. §§ 413.20(b) and

413.24(b).

2.      At the close of its fiscal year, a provider must submit a cost report to its Fiscal

Intermediary showing the costs it incurred during the fiscal year and the proportion of those costs

to be allocated to Medicare.  42 C.F.R. § 413.20.  The Fiscal Intermediary reviews the cost

report, determines the total amount of Medicare reimbursement due the provider and issues the

provider a Notice of Program Reimbursement ("NPR").  42 C.F.R. § 405.1803.  A provider

dissatisfied with the Fiscal Intermediary's final determination of total reimbursement may file an

appeal with the Provider Reimbursement Review Board ("PRRB" or "Board") within 180 days

of the issuance of the NPR.  42 U.S.C. § 1395oo(a); 42 C.F.R. § 405.1835.

3.    The Medicare program has long recognized that some indigent residents qualify

for both Medicare and Medicaid benefits.  Such patients, who are often referred to as "dually

eligible," have Medicare as their primary coverage for skilled nursing facility ("SNF") services,

and their Medicare deductibles and coinsurance are sometimes paid by the Medicaid program

operated by the states in which the residents reside.  However, some state Medicaid Plans elected

to not reimburse these costs at all, or placed limits on the amount that the Medicaid program will

reimburse, often only reimbursing up to the point that the provider receives an amount equal to

the reimbursement available under the Medicaid program.  As the Medicaid reimbursement is

often less than the parallel Medicare reimbursement, it is frequently the case that the primary

Medicare payment is equal to or greater than the Medicaid reimbursement and the Medicaid

program does not pay any of the deductible or coinsurance.  See, e.g., *GCI Health Care Centers,*

*Inc. v. Thompson*, 209 F. Supp. 2d 63, 66 (D.D.C. 2002).

4.    During the pertinent time period, the Medical Assistance ("MA") programs of

some states, including Pennsylvania and Washington, statutorily limited Medicare providers'

rights to collect deductibles and coinsurance from their MA programs and from dually eligible

state residents, as well.  As a result, providers, including SNFs, could not collect some of the

deductibles and coinsurance the Medicare program mandates from either the MA program or

dually eligible residents.  (AR 238.)

5.      In the Balanced Budget Act of 1997, Pub. L. No. 105-33, 111 Stat. 251 (1997) ("BBA"), Congress mandated in part that, beginning with cost reporting periods commencing after July 1, 1998, the Medicare program shift its reimbursement system for Part A covered services SNFs render from a cost based system to a prospective payment system ("PPS").  Along with the implementation of PPS for SNF admissions covered by Part A, Congress provided that therapy services SNFs provide would be reimbursed under the Medicare Part B fee schedule if the Medicare eligible patient was not in a covered Part A stay at the time therapy services were rendered.

6.      The Medicare program has long recognized that no collection efforts are necessary with regard to coinsurance and deductible amounts for dually eligible patients who reside in states that prohibit payment of such expenses under their state Medicaid Plans.  42 C.F.R. § 413.5(c)(6); *Hoag Mem'l Hosp.  v. Blue Cross and Blue Shield*, PRRB Hearing Dec. No. 02-028; Provider Reimbursement Manual §§ 312, 322.

7.      Prior to enactment of the BBA, SNFs were permitted to claim the uncollectible deductibles and coinsurance attributable to dually eligible patients for both Part A and Part B services as bad debts on their Medicare cost reports and obtain Medicare reimbursement.  (AR 238); 42 C.F.R. §  413.80; PRM, §§ 312, 322; *GCI Health Care Ctrs., Inc. v. Thompson*, 209 F. Supp. 2d 63, 66 (D.D.C. 2002).

**The Plaintiff Group**

8.      Each of the 21 plaintiffs is a Medicare-certified SNF owned and operated by Extendicare Health Services, Inc., a diversified health service company (collectively, "Extendicare Facilities" or "Facilities").  (AR 110-121.)

9.      The Extendicare Facilities provide, *inter alia,* physical, occupational and speech therapy services ("therapy services") to residents who require such services, as determined by their physicians and required by their plans of care.  For some of the Facilities' residents who have coverage provided by the Medicare program, these therapy services are reimbursed under Part B of the Medicare program.  (AR 134-138.)

10.     Prior to the enactment of the BBA, the Facilities claimed the unpaid deductibles and coinsurance amounts for Part A and Part B services rendered to dually eligible patients on the Medicare cost reports submitted to their national fiscal intermediary ("UGS" or "Intermediary"), and UGS routinely reimbursed these claims without controversy.  (AR 238.)

11.     Under the new system for SNF services, the patient remains responsible for payment of deductibles and coinsurance for both Part A and Part B services, just as before. (BBA.)  Thus, the Extendicare Facilities continued to be unable to collect deductibles and coinsurance for therapy services payable under the Part B schedule provided to dually eligible residents of states that prohibit collection of deductions from either the state's MA program or its residents.  (AR 134-138.)

12.     Extendicare reported the uncollectible deductibles and coinsurance related to both Part A and Part B services rendered to dually eligible patients as bad debts on the Facilities' 1999 Medicare cost reports.  (Id.)  When UGS audited the Extendicare Facilities' 1999 Medicare cost reports, it disallowed the bad debt claims for services rendered to dually eligible patients that were subject to payment under the Medicare Part B fee schedule on the grounds that those claims did not constitute reimbursable bad debt.  (Id.)

13.     None of the Extendicare Facilities' bad debt claims were disallowed in whole or in part because of any failure on the part of the Extendicare Facilities to meet the criteria set forth in 42 C.F.R. § 413.80(e), including adequacy of their collection efforts.  (Id.)

**Procedural History**

14.     Each of the Facilities timely appealed to the PRRB.  Although some of the Facilities raised additional issues at the time the individual appeals were filed, these were administratively resolved.  (AR 108-139.)  At that time, the Facilities also requested that they be permitted to pursue the Part B bad debt issue as a group appeal (Id.).  The Board granted this request by letter dated October 3, 2002.  (Id.)  Extendicare filed the necessary jurisdictional documents on October 23, 2002, and UGS agreed that there were no jurisdictional impediments to the Board's review of the appeal.  (Id.)  Four of the Extendicare Facilities withdrew their claims; the parties stipulated to certain factual matters, including the amount of Part B bad debt in controversy for each of the 24 Extendicare Facilities that then remained in the group appeal. (Id.)

15.     The appeal was heard by the PRRB on February 3, 2005.  (AR 265.)  On July 21, 2006, the PRRB issued its decision.  (AR 59-66.)  After consideration of Medicare law and guidelines, the parties' contentions and the evidence contained in the record, the Board concluded that the Intermediary's adjustments were improper.  (AR 59.)  The Board noted that § 1861(b)(1)(A)(i) of the Social Security Act articulates the principle against cross-subsidization, which provides that the cost for individuals covered by Medicare must not be borne by individuals not covered by the program and costs for individuals not covered by the program must not be borne by Medicare, and that the Secretary, by regulation, had adopted that policy and incorporated it in the anti cross-subsidization principle.  (AR 62.)  It further observed that,

while the BBA of 1997 shifted the basis of payment for SNF outpatient rehabilitation services from cost-based to fee-based, it made no mention of related bad debt and there was no change to 42 C.F.R. § 413.80.  (Id.)

16.     The PRRB also reasoned that, if Congress had intended to address Part B bad debts, it would have done so in the statutes as it did for physicians' assistants, durable medical equipment suppliers ("DME") and Certified Registered Nurse Anesthetist ("CRNA") services. (AR at 63.)  The Board also noted that the then proposed rule, which would have eliminated bad debts arising from any service provided under a fee schedule, was evidence that the "existent regulations allowed bad debts for some fee-based services."  (Id.)  Thus, the Board concluded:

> SNF debt policy was established by operation of regulation and,
> when Congress changed the statute, it gave  no indication that
> regulations should be modified.  Absent a change in that
> regulation, the Board majority cannot modify or eliminate its
> mandate and must conclude that 42 C.F.R. § 413.80 remains the
> controlling authority for the payment of bad debts.

(Id.)

17.     One member of the Board dissented, noting that Medicare's bad debt reimbursement policy is found in 42 C.F.R. Chapter 413, entitled "Principles of Reasonable Cost Reimbursement . . ." and that there is no bad debt reimbursement policy in the chapter of the regulations that govern reimbursement and determine under a fee schedule -- Chapter 414.  (AR 66.)  She also observed that, it was her understanding, confirmed by recent research, the Medicare program had never reimbursed bad debts associated with fee-reimbursed services. (Id.)

18.     The Intermediary requested review of the PRRB's decision.  (AR 53-55.)  The Center for Medicare Management also submitted comments seeking review.  (AR 49-52.)  By letter dated August 8, 2006, the Administrator notified the parties that the Board's decision

would be reviewed.  (AR 47-48.)  On September 12, 2006, the Administrator, following receipt

of comments from the Extendicare Facilities, issued a final administrative decision (AR 2-17),

wherein he reversed the PRRB's decision, concluding:

> Applying the law to the facts of this case, the Administrator finds
> that the Intermediary properly denied the Providers' claimed
> Medicare bad debts relating to uncollectible deductibles and
> coinsurance arising from therapy services provided to patients who
> are not in a covered Part A stay and for which payment was
> determined in accordance with the Part B fee schedule.  The
> Administrator finds that the BBA of 1997 changed the basis of
> payments from reasonable cost to a fee schedule for these services.
> Medicare's long standing policy has been not to pay for bad debts
> for any services paid under a reasonable charge or fee schedule
> methodology.

(AR 11.)

Respectfully submitted,


/s/  John R. Jacob
John R. Jacob
D.C. Bar No. 444412
AKIN GUMP STRAUSS HAUER & FELD LLP
Robert S. Strauss Building
1333 New Hampshire Avenue, NW
Washington, D.C. 20036
Telephone:  202-887-4582
Fax:  202-955-7648
Email:  jjacob@akingump.com


OF COUNSEL:
Daniel F. Miller
Barbara J. Janaszek
WHYTE HIRSCHBOECK DUDEK S.C.
555 E. Wells Street
Suite 1900
Milwaukee, WI 53202-3819
Telephone:  414-273-2100
Fax:  414-223-5000
Email:  dmiller@whdlaw.com
Email:  bjanaszek@whdlaw.com

Attorneys for Plaintiffs

Dated:  June 15, 2007

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
ABINGTON CREST NURSING AND                    )
REHABILITATION CENTER, et al.,                )
                                              )
Plaintiffs,                                   )
                                              )
v.                                            )          Civil Action No. 1:06cv01932 (RJL)
                                              )
MICHAEL O. LEAVITT,                           )
Secretary, United States Department of        )
Health And Human Services                     )
                                              )
Defendant.                                    )
_____)

**[PROPOSED] ORDER**


Upon consideration of the Plaintiffs' Motion for Summary Judgment, and the entire

record herein, it is hereby

ORDERED that, as to the Plaintiffs' Motion for Summary Judgment, the Court

finds that the material facts are not in dispute and that judgment should enter for Plaintiffs as a

matter of law, and it is therefore ORDERED that the Plaintiff's Motion for Summary Judgment

be and hereby is GRANTED.



Date: _____                              _____
                                             United States District Judge