IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ABINGTON CREST NURSING AND | ) | |
| REHABILITATION CENTER, et al. | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:06CV01932 (RJL) |
| | ) | |
| MICHAEL O. LEAVITT, | ) | |
| Secretary, United States Department of | ) | |
| Health and Human Services, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56(b), Defendant, Michael O. Leavitt,

Secretary of Health and Human Services, by and through his undersigned counsel, respectfully

moves this Court for summary judgment on the grounds that there are no material facts in dispute

and that Defendant is entitled to judgment as a matter of law.  In support of the instant motion,

the Court is respectfully referred to the accompanying Statement of Material Facts Not In

Genuine Issue, and Memorandum of Points and Authorities in Support of Defendant's Motion

for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment.  A

proposed order is also attached.

Respectfully submitted,

 /s/
JEFFREY A. TAYLOR
United States Attorney
D.C. Bar No. 498610

/s/
MEGAN L. ROSE
Assistant United States Attorney
N.C. Bar No. 28639
United States Attorney's Office
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
(202) 514-7220


/s/
TRACEY GLOVER
U.S. Department of Health and Human Services
Office of the General Counsel
Centers for Medicare and Medicaid Services
330 Independence Ave., S.W., Room 5309
Washington, D.C. 20201


OF COUNSEL:

DANIEL MERON
General Counsel

JANICE L. HOFFMAN
Acting Associate General Counsel

MARK D. POLSTON
Deputy Associate General
Counsel for Litigation

United States Department of
Health and Human Services

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ABINGTON CREST NURSING AND<br>REHABILITATION CENTER, et al.<br><br><br>         Plaintiffs,<br><br>    v.<br><br>MICHAEL O. LEAVITT,<br>Secretary, United States Department of<br>Health and Human Services,<br><br>         Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)   Case No. 1:06CV01932 (RJL)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DEFENDANT'S STATEMENT OF MATERIAL FACTS**
**AS TO WHICH THERE IS NO GENUINE ISSUE**

Pursuant to Local Rule 7(h), Defendant submits the following statement of material facts as to which there is no dispute.

1. Plaintiffs are Medicare certified Skilled Nursing Facilities ("SNFs") owned and operated by Extendicare Health Services, Inc. A.R. 110-121.

2. Defendant, Michael O. Leavitt, is the Secretary of the United States Department of Health and Human Services ("Secretary"). Complaint and Answer ¶5. The Secretary is responsible for administering the Medicare program. *Id.*

3. The Secretary has delegated responsibility for much of the Medicare program to the Centers for Medicare and Medicaid Services ("CMS"), formerly the Health Care Financing Administration ("HCFA").

4. CMS contracts out many of its payment and audit functions to insurance companies known as fiscal intermediaries ("FIs"). FIs determine payment amounts due to providers under

Medicare law and regulations.  See 42 USC § 1395(h), 42 CFR § § 413.20(b) and 413.24(b).  At the close of the fiscal year, the provider submits a cost report to the FI which shows the costs the provider incurred during the fiscal year and the proportion of those costs to be allocated to Medicare. 42 CFR § 413.20.  The fiscal intermediary reviews the cost report, makes a determination of the total Medicare reimbursement due and then issues a Notice of Program Reimbursement ("NPR") to the provider.  42 C.F.R. § 405.1803.

5.  A provider that is dissatisfied with a "final determination" of its fiscal intermediary "as to the amount of total program reimbursement due the providers . . . for the period covered by such [cost] report" may request a hearing before the Provider Reimbursement Review Board ("PRRB" or "Board") if all applicable jurisdictional requirements are met.  42 U.S.C. § 1395oo(a)(1)(A)(I).  The PRRB's decision is final, unless the Secretary, acting through the CMS Administrator, within 60 days, reverses, affirms, or modifies the decision.  42 U.S.C. § 1395oo(f)(1); 42 C.F.R. §§ 405.1871(b), 405.1875(a).   Providers may obtain judicial review of a "final decision" of the PRRB, or the Secretary, if the Secretary exercises his right of review.  42 U.S.C. § 1395oo(f)(1).

6.  Until July 1, 1998, SNFs were paid according to a retrospective, reasonable cost-based system.

7.  Pursuant to 42 C.F.R. § 413.80 (2000), providers that are paid on a reasonable cost basis are reimbursed for uncollectible coinsurance and deductible amounts ("bad debts").

8.  In the Balanced Budget Act of 1997 ("BBA 97"), Congress established a prospective payment system ("PPS") for SNFs that has eliminated the retrospective cost-based reimbursement scheme formerly in place for SNFs.  In its place, Congress enacted a prospective

payment system based on a federal per diem rate.  Pub. L. 105-33, § 4432(a), 111 Stat. 414-20

(reprinted in 1997 U.S. Code Cong. & Ad. News, No. 7 (1997), adding sections 1888(e)(4)(D)(i)-

(ii), (e)(4)(E) to the statute.)

9.  In addition, the BBA provides that therapy services provided by SNFs will be

reimbursed under Part B if the Medicare beneficiary is not in a covered Part A stay at the time

therapy services are given.  See 42 C.F.R. § § 410.60(c)); 410.152(b)(1).

10.  Pursuant to section 4432(b)(3), the BBA further provided that commencing after July

1, 1998,  Part B covered services provided to SNF residents, such as those at issue in this case,

would be paid for according to the fee schedule for such item or service.

11.  Plaintiffs claimed reimbursement for bad debts related to uncollectible deductibles

and coinsurance arising from therapy services provided to patients that were dually eligible for

Medicare and Medicaid, also known as Qualified Medicare beneficiaries, that were paid under

the Medicare Part B fee schedule for fiscal year ("FY") 1999 cost reports.  Complaint and

Answer ¶¶ 23, A.R. 2-3.

12.  On or around September 26, 2001, United Government Services LLC (the providers'

intermediary) audited the providers FY1999 cost report, and disallowed providers claims for bad

debts arising from uncollected deductibles and coinsurance. A.R.61, Complaint and Answer

¶¶24.

13.  The intermediary disallowed providers claims on the grounds that it is Medicare's

policy that "payment of beneficiary deductible and coinsurance bad debts applies only to the

reasonable cost payment system." A.R. 239.

14. On or around March 12, 2002 providers each filed individual appeals with the

Provider Reimbursement Review Board ("PRRB" or "Board").  Complaint and Answer ¶¶ 26.

15.  Plaintiffs requested that the PRRB treat their appeals as a group appeal, which

request was granted by the Board by letter dated October 3, 2002. Complaint and Answer, ¶¶ 28.

16.  The PRRB conducted a hearing on February 3, 2005.  Complaint and Answer, ¶¶31.

17.  The Board issued its decision in the case on July 21, 2006 (PRRB Decision 2006-

D36), wherein it found that "[t]he intermediary's adjustment to the Providers' uncollectible

deductibles and coinsurance arising from therapy services paid under the Part B fee schedule was

improper."  A.R. 56-66.

18.  One member of the Board, Elaine Crews Powell, CPA, dissented from the decision.

In her dissent, Board member Powell stated:

> . . . [T]here is no bad debt reimbursement policy in the chapter of the regulation that
> governs reimbursement determined under a fee schedule- Chapter 414.  The inference
> that I draw from this fact is that under fee schedule reimbursement Medicare has
> established the maximum amount it will pay for certain services, and no additional
> payment will be made for bad debts.  When the program sets a fee schedule as the basis
> for paying for a given service, it is no longer sharing proportionately in the cost of
> providing those services.  Therefore, the cost reimbursement principles, including the bad
> debt regulation at § 413.80, are not applicable.  Congress mandated that Part B therapy
> services be paid on a fee schedule, and it made no provision for bad debt reimbursement.
> Therefore, it is clear to me that Congress intended that the fee schedule to be [sic] the
> exclusive payment mechanism for these services. . . . I also find it necessary to state that
> is my long-standing, personal understanding that the Program has never reimbursed bad
> debts associated with fee-reimbursed services. This is because the established fee screens
> took into account the cost of doing business, including bad debts.

A.R. at 66.

19.  In an opinion dated September 12, 2006, the Secretary, acting through his designated

agent, the Deputy Administrator of CMS, issued a final determination in the form of an

Administrator's Decision, wherein he reversed the PRRB's decision.  In the Decision, the

-4-

Administrator stated that "Medicare's longstanding policy has been not to pay for bad debts for any services paid under a reasonable charge or fee schedule methodology . . . [and] the bad debt provisions found at 42 C.F.R. 413.80(e) do not apply to services for which Medicare payment is based on reasonable charges or fee schedule methodology." A.R. 12.  The Administrator concluded that "the Intermediary properly denied payment for the bad debts that are the subject of this appeal."  A.R.2-17.

20.  On November 13, 2006, Plaintiffs filed a complaint in the current action with this Court.

Respectfully submitted,

_____/s/_____
JEFFREY A. TAYLOR
United States Attorney
D.C. Bar No. 498610


_____/s/_____
MEGAN L. ROSE
Assistant United States Attorney
N.C. Bar No. 28639
Civil Division
555 4th Street, N.W.
Washington, D.C.  20530
(202) 514-7220 / FAX: (202) 514-8780


TRACEY GLOVER
U.S. Department of Health and Human Services
Office of the General Counsel
Centers for Medicare & Medicaid Services Division
330 Independence Ave., S.W., Room 5309
Washington, D.C.  20201

OF COUNSEL:

DANIEL MERON
General Counsel

JANICE L. HOFFMAN
Acting Associate General Counsel

MARK D. POLSTON
Deputy Associate General
Counsel for Litigation

United States Department of
Health and Human Services

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ABINGTON CREST NURSING AND<br>REHABILITATION CENTER, et al.<br><br><br>Plaintiffs,<br><br>v.<br><br>MICHAEL O. LEAVITT,<br>Secretary, United States Department of<br>Health and Human Services,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 1:06CV01932 (RJL)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DEFENDANT'S CONCISE STATEMENT OF GENUINE ISSUES**

Defendant, Michael O. Leavitt,  the Secretary of Health and Human Services ("the

Secretary"), hereby responds to Plaintiff's Rule 7(h) Statement of Material Facts Not In Dispute

("Plaintiff's Statement") in accordance with Rules 56 of the Federal Rules of Civil Procedure and

Local Rules 7(h) and 56.

Plaintiff's Statement (specifically, the allegations in paragraphs 2, 3, 4, 5, 6, 7, 10, 11, 13,

15, 18) contains legal conclusions and characterizations of this action, various documents in the

record, legal authorities and administrative decisions, not undisputed facts.  Defendant avers that,

to the extent that the parties disagree as to the facts underlying the present action, those

disagreements are not material.  Indeed, all material facts are those found in the record, under the

Medicare Act, 42 U.S.C. § 1395oo(f)(1), and the Administrative Procedure Act, 5 U.S.C .

§ 706(2).  The facts found by the agency are reviewed to determine whether they are supported

by substantial evidence taken as a whole.  There are no triable issues of fact.  Nevertheless,

responding specifically to the numbered paragraphs of Plaintiff's Statement and using the same

paragraph numbering, Defendant responds to the following specific assertions in Plaintiffs'

Statement:

4. Denies that the statement in this paragraph is supported by the portion of the

Administrative Record cited by Plaintiffs. A.R. 238 is only a portion of the Intermediary's

position paper before the Board and does not address the issue of whether some states statutorily

limited Medicare providers' rights to collect deductibles and coinsurance, or what effect such

limits had on Plaintiffs' ability to collect unpaid deductibles and coinsurance amounts.

10. Defendant denies that prior to enactment of the BBA, "UGS routinely reimbursed . . .

claims [for bad debts] without controversy."



Respectfully submitted,


 /s/
JEFFREY A. TAYLOR
United States Attorney
D.C. Bar No. 498610


 /s/
MEGAN ROSE
Assistant United States Attorney
N.C. Bar No. 28639
Civil Division
555 4th Street, N.W.
Washington, D.C.  20530
(202) 514-7220 / FAX: (202) 514-8780

_/s/_____

TRACEY GLOVER_____

U.S. Department of Health and Human Services
Office of the General Counsel
Centers for Medicare and Medicaid Services
330 Independence Ave., S.W., Room 5309
Washington, D.C. 20201
202-205-8705/FAX 202-401-1405

OF COUNSEL:

DANIEL MERON
General Counsel

JANICE L. HOFFMAN
Acting Associate General Counsel

MARK D. POLSTON
Deputy Associate General
Counsel for Litigation

United States Department of
Health and Human Services

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ABINGTON CREST NURSING AND    )
REHABILITATION CENTER, et al.    )
                                )
                                )
        Plaintiffs,             )
                                )
    v.                          )    Case No. 1:06CV01932 (RJL)
                                )
MICHAEL O. LEAVITT,             )
Secretary, United States Department of    )
Health and Human Services,      )
                                )
        Defendant.              )
_____  )

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S
CROSS MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**<u>INTRODUCTION</u>**

Plaintiffs, Abington Crest Nursing & Rehabilitation Center, *et al.*, a group of Skilled

Nursing Facilities ("SNFs"), have filed this action to challenge a final decision of the Secretary

of the Department of Health and Human Services ("the Secretary").  In his final decision, the

Secretary disallowed claims made by providers for reimbursement of the costs for bad debts

related to uncollectible deductible and coinsurance amounts arising from therapy services

Plaintiffs furnished to patients during fiscal year ("FY") 1999.  These services were paid for

under the Part B fee schedule that was mandated by Congress in the Balanced Budget Act of

1997 for services rendered after July 1, 1998.  Prior to this time, such services were paid for

under an entirely different payment methodology, one in which payment is based on the

"reasonable costs" of the facility furnishing the services.  One feature of the former reasonable

cost payment system was a policy of reimbursing providers for their costs of bad debts. However, the fee schedule payment methodology makes no provision for reimbursement for bad debts, and it has long been Medicare's policy <u>not</u> to pay for the cost of bad debts for any services reimbursed under a fee schedule methodology. Consistent with that longstanding policy, the regulations governing payment under Medicare Part B fee schedules, found in 42 C.F.R., Part 414, do not provide for payment of bad debts for *any* services. The regulation providing for the payments of bad debts during the period relevant here, 42 C.F.R. 413.80, further supports the Secretary's policy of not paying for bad debts for services paid under a fee schedule is thus supported by all applicable law and regulations. Moreover, the Secretary's decision is supported by substantial evidence, and his policy of not reimbursing bad debts for services paid for pursuant to a fee schedule is reasonable. Therefore, pursuant to the familiar deferential standard of review, the Secretary's decision should be affirmed.

## STATUTORY AND REGULATORY BACKGROUND

I.    <u>THE MEDICARE PROGRAM GENERALLY</u>

This action arises under Title XVIII of the Social Security Act, 42 U.S.C., § 1395 *et seq.*, commonly referred to as the Medicare statute, which establishes a federally funded health insurance program for the elderly and disabled. *See* 42 U.S.C. §§ 1395c, 1395j, 1395k. The program is administered by the Centers for Medicare & Medicaid Services ("CMS"), formerly the Health Care Financing Administration, on behalf of the Secretary, who is ultimately responsible for the program. Part A of the Medicare program authorizes payments for covered inpatient hospital, home health and hospice treatment and related services. Part B authorizes

payment for covered items and services provided to individuals such as physicians' treatment,

clinical laboratory tests, durable medical equipment or other services not covered by Part A.

Medicare Part A authorizes payment for covered institutional care, including payment to

hospitals and other inpatient entities including skilled nursing facilities ("SNF"s).  Part A

services are furnished by "providers of services" that have entered into a "provider agreement"

with the Secretary.  42 U.S.C. §§ 1395x(u), 1395cc.  Private insurance companies, known as

"fiscal intermediaries," acting as agents of the Secretary, process reimbursement to providers.

42 U.S.C. § 1395h.  Generally, at the close of each fiscal year, a provider is required to file a

Medicare cost report with its intermediary.  42 C.F.R. § 413.24(f).  The intermediary reviews the

cost report and determines in a notice of program reimbursement ("NPR") the amount of

Medicare reimbursement due the provider for that cost year.  42 C.F.R. § 405.1803.  If the

provider is dissatisfied with the NPR, it can appeal to the Provider Reimbursement Review

Board ("PRRB" or "Board") (if all jurisdictional requirements are met) and then can eventually

seek judicial review.  See 42 U.S.C. § 1395oo; 42 C.F.R. part 405, Subpart R.

II.    PAYMENT TO SNFS

For services furnished to Medicare beneficiaries prior to July 1, 1998, Medicare

reimbursed SNFs for the facilities' "reasonable costs" of the services.  See 42 U.S.C.

§ 1395f(b)(1); 1395x(v)(1)(A).  Specifically, during this period, therapy services furnished by

SNFs to Medicare beneficiaries who were not in a covered Part A stay in the facility were

reimbursed as Part B services pursuant to the reasonable cost methodology.  See 42 C.F.R.

§ § 410.60(c); 410.152(b)(1).

In the Balanced Budget Act of 1997 ("BBA 97"), however, Congress established a

-3-

prospective payment system ("PPS") that has eliminated the retrospective cost-based

reimbursement scheme for SNFs.  In its place, Congress enacted a prospective payment system

based on a federal per diem rate.  Pub. L. 105-33, § 4432(a), 111 Stat. 414-20 (reprinted in 1997

U.S. Code Cong. & Ad. News, No. 7 (1997), adding section 1888(e)to the Social Security Act,

codified at 42 U.S.C. § 1395yy(e).[1]  In addition, the section 4432(b)(3) of the BBA provides that

therapy services provided by SNFs will be reimbursed under Medicare Part B if the Medicare

beneficiary is not in a covered Part A stay at the time therapy services are furnished.

III.    PAYMENT FOR MEDICARE PART B SERVICES UNDER THE FEE SCHEDULE

Pursuant to § 6102 of the Omnibus Reconciliation Act (OBRA) of 1989,  Title XVIII of

the Act was amended by adding § 1848 entitled "Payment for Physician Services." codified at 41

U.S.C.§ 1395w-4.  The new provision implemented a fee schedule to replace the "reasonable

charge" payment mechanism formerly in place for physician services.  As noted immediately

above, section 4432(b)(3) the BBA provided that Part B covered services provided to SNF

residents, such as those at issue in this case, would be paid for according to the fee schedule for

such item or service.  Section  4541 of the BBA added a new § 1833(a)(8) to the Act (codified at

---

[1] These amendments apply to cost reporting periods beginning on or after July 1, 1998.  P.L. 105-33, § 4432(d), 111 Stat. 422.  The federal per diem rate that we describe applies after completion of a three year transition period. Id. § 4432(a), 111 Stat. 415, adding section 1888(e)(1)(B) to the Statute.  During the three year transition period, reimbursement is based on a combination of a facility specific rate, and a federal rate, with the federal rate gradually assuming greater weight.  Thus, for the first transition year, reimbursement is based on 75% of the facility specific rate, plus 25% of the federal rate; the second year is based on 50% of each rate; and the third year is based on 25% of the facility specific rate and 75% of the federal rate.  Thereafter, reimbursement is entirely based on the federal rate.  P.L. 105-33, § 4432(a), 111 Stat. 414-416, adding sections 1888(e)(1)(A), (e)(2)(C) to the Act; see also H.R. Conf. Rep. No. 105-217, 105th Cong., 1st Sess.  754, 756, reprinted in 1997 U.S. Code Cong. & Admin. News 375, 377 (No. 7, September 1997).

42 U.S.C. 1395l(a)(8)), to specify that the amounts payable for outpatient rehabilitation services

provided by SNFs will be determined under § 1834(k) of the Act (codified at 42

U.S.C.§ 1395m.)  Section 1834(k) of the Act in turn provides that payments for outpatient

therapy or outpatient rehabilitation services will be paid for according to the physician fee

schedule set forth at § 1848 of the Act.

The end result of these interlacing statutory provisions is expressed in the implementing

regulation at 42 C.F.R. 413.1(g)(2) (2000), which  provides that payment for services provided in

SNFs

> [t]hat are furnished on or after July 1, 1998, to a resident who is not in a covered
> Part A stay,  is determined in accordance with any applicable Part B fee schedule,
> or for a particular item or service to which no fee schedule applies, by using the
> existing payment methodology utilized under part B for such items or services.

Id.

IV.    PAYMENT FOR MEDICARE PROVIDERS' COSTS OF BAD DEBTS

One element of the definition of reasonable cost found at 42 U.S.C. § 1395x is that costs

for individuals covered by the Medicare program must not be borne by individuals not covered

by the program, and that costs for individuals not covered by the program must not be borne by

Medicare.  42 U.S.C. 1395x(v)(1)(A).  This is known as the prohibition of cross-subsidization.

In order to avoid such prohibited cross-subsidization,  Medicare reimburses providers that are

paid on the basis of their reasonable costs for deductible and co-insurance amounts that remain

unpaid for services rendered to Medicare beneficiaries.  42 C.F.R. §  413.80(d) (2000).[2]  The

---

[2] The regulation was subsequently recodified at 42 C.F.R. § 413.89. 69 Fed. Reg. 49,254 (Aug. 11, 2004). In
addition, the regulation was revised effective January 1, 2007 to clarify that bad debts are not reimbursable under a
fee schedule methodology. See 42 C.F.R. 413.89 (2007).  Because the controlling regulation was found at 42 C.F.R.
§ 413.80 at the time the claimed costs were disallowed, that is the citation used throughout this memorandum.

implementing regulation states that "[t]he failure of beneficiaries to pay the deductibles and co-insurance amounts could result in the related costs of covered services being borne by others. The costs attributable to the deductible and co-insurance amounts that remain unpaid are added to the Medicare share of allowable costs." Id. This regulatory provision is found within 42 C.F.R. Part 413 ("Principles of Reasonable Cost Reimbursement"), subpart F ("Specific Categories of Cost").

## STATEMENT OF FACTS

Plaintiffs claimed reimbursement for bad debts related to uncollectible deductibles and coinsurance arising from therapy services provided to patients that were dually eligible for Medicare and Medicaid, also known as Qualified Medicare beneficiaries, that were paid under the Medicare Part B fee schedule for fiscal year ("FY") 1999 cost reports. Complaint and Answer ¶¶ 23, A.R. 2-3.

On or around September 26, 2001, United Government Services LLC (the providers' intermediary) audited the providers FY1999 cost report, and disallowed providers claims for bad debts arising from uncollected deductibles and coinsurance. A.R.61, Complaint and Answer, ¶¶ 24.

The intermediary disallowed providers claims on the grounds that it is Medicare's policy that "payment of beneficiary deductible and coinsurance bad debts applies only to the reasonable cost payment system." A.R. 239.

On or around March 12, 2002 providers each filed individual appeals with the Provider Reimbursement Review Board ("PRRB" or "Board"). Complaint and Answer ¶¶ 26.

Plaintiffs requested that the PRRB treat their appeals as a group appeal, which request

was granted by the Board by letter dated October 3, 2002. Complaint and Answer, ¶¶ 28.

The PRRB conducted a hearing on February 3, 2005.  Complaint and Answer, ¶¶ 31.

The Board issued its decision in the case on July 21, 2006 (PRRB Decision 2006-D36), wherein it found that "[t]he intermediary's adjustment to the Providers' uncollectible deductibles and coinsurance arising from therapy services paid under the Part B fee schedule was improper." A.R. 56-66.

One member of the Board, Elaine Crews Powell, CPA, dissented from the decision. In her dissent, Board member Powell stated:

> . . . [T]here is no bad debt reimbursement policy in the chapter of the regulation that governs reimbursement determined under a fee schedule- Chapter 414.  The inference that I draw from this fact is that under fee schedule reimbursement Medicare has established the maximum amount it will pay for certain services, and no additional payment will be made for bad debts.  When the program sets a fee schedule as the basis for paying for a given service, it is no longer sharing proportionately in the cost of providing those services.  Therefore, the cost reimbursement principles, including the bad debt regulation at § 413.80, are not applicable.  Congress mandated that Part B therapy services be paid on a fee schedule, and it made no provision for bad debt reimbursement. Therefore, it is clear to me that Congress intended that the fee schedule to be [sic] the exclusive payment mechanism for these services. . . . I also find it necessary to state that is my long-standing, personal understanding that the Program has never reimbursed bad debts associated with fee-reimbursed services. This is because the established fee screens took into account the cost of doing business, including bad debts.

A.R. at 66.

In an opinion dated September 12, 2006, the Secretary, acting through his designated agent, the Deputy Administrator of CMS, issued a final determination in the form of an Administrator's Decision, wherein he reversed the PRRB's decision.  In the Decision, the Administrator stated that "Medicare's longstanding policy has been not to pay for bad debts for any services paid under a reasonable charge or fee schedule methodology . . . [and] the bad debt

provisions found at 42 C.F.R. 413.80(e) do not apply to services for which Medicare payment is

based on reasonable charges or fee schedule methodology." A.R. 12. The Administrator

concluded that "the Intermediary properly denied payment for the bad debts that are the subject

of this appeal." A.R. 2-17.

On November 13, 2006, Plaintiffs filed the instant complaint in this Court.

## ARGUMENT

I.    A Narrow Standard of Judicial Review Governs This Action.

This Court's subject matter jurisdiction over this matter is based on 42 U.S.C.

§1395oo(f)(1), which provides for judicial review of final Medicare provider reimbursement

decisions under the terms of the Administrative Procedure Act (APA), 5 U.S.C. §701 *et seq*. *See*

*Memorial Hospital/Adair County Health Center, Inc. v. Bowen*, 829 F.2d 111, 116-17 (D.C. Cir.

l987) ("*Adair County*"); *see also Steenholdt v. FAA*, 314 F.3d 633, 638 (D.C. Cir. 2003). Chapter

7 of the APA provides that those adversely affected or aggrieved by agency action may obtain

judicial review of a final agency action, except to the extent that "(1) statutes preclude judicial

review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. §§ 701(a), 702,

704. If judicial review is permitted, Chapter 7 authorizes the reviewing court to set aside agency

action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law," or "unsupported by substantial evidence in a case . . . reviewed on the record of an agency

hearing provided by statute." 5 U.S.C. § 706(2)(A), (E); *Citizens to Preserve Overton Park v.*

*Volpe*, 401 U.S. 402, 413-15 (1971); *Adair County*, 829 F.2d at 116-17.

Although the judiciary bears the responsibility under the APA to set aside agency

decisions that meet this description, *see MD Pharmaceutical, Inc. v. Drug Enforcement Admin.*,

133 F.3d 8, 16 (D.C. Cir.1998), "[t]he scope of review under the 'arbitrary and capricious

standard' is narrow and a court is not to substitute its judgment for that of the agency." *Motor*

*Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Rather, the

court's task is to determine whether the agency's decision is "within the bounds of reasoned

decision making." *Baltimore Gas & Elec. Co. v Natural Resources Defense Council*, 462 U.S.

87, 105 (1983).  This highly deferential standard presumes the agency action to be valid.  *See*

*Kisser v. Cisneros*, 14 F.3d 615, 619 (D.C. Cir. 1994); *see also International Broth. of Teamsters*

*v. United States*, 735 F.2d 1525, 1534 (D.C. Cir. 1984).

        Similarly narrow is review under the substantial evidence standard.  The Supreme Court

has "defined 'substantial evidence' as 'such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion.'" *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 619-

20 (1966)(quoting *Consolidated Edison Co. Of New York v. NLRB*, 305 U.S. 197, 229 (1938)).

Substantial evidence is "something less than the weight of the evidence, and the possibility of

drawing two inconsistent conclusions from the evidence does not prevent an administrative

agency's findings from being supported by substantial evidence." *Id.* at 620.

        Indeed, in cases similar to the one at hand, the Secretary's interpretation of his rules has

been given controlling weight, "unless an alternative reading is compelled by the regulation's

plain language or other indications of the Secretary's intent at the time of the regulation's

promulgation." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (internal quotation

marks and citation omitted); *see also Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87 (1995).

Broad deference to the Secretary's interpretation of his own regulations is "all the more

warranted when, as here, the regulation concerns 'a complex and highly technical regulatory

program'." *Thomas Jefferson*, 512 U.S. at 512 (*citing Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 697 (1991)).

Accordingly, for all of the reasons set forth below, the Court should give broad deference to the Secretary's interpretation of his regulations in this complex and highly technical case. Because the Secretary's decision to limit reimbursement of bad debts to services paid for under a reasonable cost methodology is completely reasonable and consistent with the controlling statute and regulations, the Secretary's decision should be upheld.

II.     Under All Applicable Law and Regulations, Bad Debts Are a Feature of
        Reasonable Cost Reimbursement and Are Not Paid for Under a Fee Schedule.

Plaintiffs argue that despite a change in the law that switched the methodology under which they were paid for the services at issue here from one based on reasonable cost to one based on a fee schedule, they are still entitled to reimbursement for bad debts.  Plaintiffs' Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment ("Pls.' Mem. Summ. J.") at 12-14.   However, bad debts are a feature of a reasonable cost system. 42. C.F.R. § 413.80.  The prohibition of cross subsidization that gave rise to the Secretary's bad debts regulation is in fact found exclusively in the very definition of the term "reasonable costs." 42 U.S.C. 1395x(v)(1)(A).  The regulations governing reasonable cost payment methodology are found in 42 C.F.R. part 413, subpart A-G.  The regulation pertaining to bad debts is found in subpart F of this part at 413.80.  Subpart F is entitled "Specific Categories of Costs."  By contrast, there is no equivalent bad debt reimbursement regulation found in Part 414, which contains the regulations governing reimbursement under a Part B fee schedule.  It is important to note that these payment methodologies are separate and distinct and

-10-

accordingly that Plaintiffs *categorically* fail to qualify for bad debt reimbursement.  As Plaintiffs freely admit, (Pls.' Mem. Summ. J. at 3-4), they were paid for the services at issue here under the Part B fee schedule methodology, which simply makes no provision for reimbursement for bad debts.

Plaintiffs' sweeping statement that under Medicare, providers are to be reimbursed for "'reasonable costs' in providing care to Medicare patients" (Pls.' Mem. Summ. J. at 9) expresses a misapprehension of the controlling law that permeates the providers' entire analysis.   In fact, pursuant to both statute and regulation, most providers are *not* paid on a reasonable cost basis.  It is beyond dispute that the BBA changed Medicare reimbursement to SNFs from a reasonable cost methodology to a prospective payment methodology, and also specifically provided that SNF services furnished to Medicare beneficiaries not in a covered Part A stay were to be reimbursed according to the Part B fee schedule.  Accordingly, the regulation at 42 C.F.R. § 413.1(b), specifically states that *"[e]xcept as provided under (c) through (h) of this section*, Medicare is generally required . . . to pay for services on the basis of reasonable costs." 42 C.F.R. § 413.1(b)(emphasis added).  Section (g), which relates to payments of services furnished in SNFs and includes an exception to the reasonable cost methodology, provides that "[t]he amount paid for services . . .[t]hat are furnished in cost reporting periods beginning on or after July 1, 1998, to a resident who is not in a covered Part A stay, is determined in accordance with any applicable Part B fee schedule . . ." 42 C.F.R. § 413.1(g)(2)(ii).  It is undisputed that the services at issue in this case are those that were "furnished in cost reporting periods beginning on or after July 1, 1998, to a resident who is not in a covered Part A stay."  Thus, payment for such services are not made on a reasonable cost basis but rather are made pursuant to a fee schedule,

and they do not qualify for bad debt payment.

Plaintiffs also argue that because Congress did not specifically address bad debts when it amended the payment methodology for SNFs in the BBA, the Court should infer that Congress intended for Medicare to continue paying for bad debts as it had done in pre-BBA time periods under the former payment methodology. Pls.' Mem. Summ. J. at 13. First, Congress has not been silent on this issue. By switching SNFs from the reasonable cost payment methodology to the prospective system/fee schedule, Congress clearly has indicated its intention that SNFs no longer partake of any aspect of reasonable cost payment. Moreover, when Congress is silent on a matter, the question for the courts is whether the agency's decision is based on a permissible construction of the statute, and if it is, the court must defer to that decision. *See, e.g. Chevron USA v. Natural Resources Defense Council*, 467 U.S. 837 (1984). The Secretary's decision here easily meets that standard.

Finally, it is important to note that Congress also has implicitly approved the Secretary's bad debt policy. Medicare still reimburses SNFs for the costs of bad debts for services not paid under the fee schedule. In 2003 the Secretary proposed to reduce such payments. In the Deficit Reduction Act ("DRA") of 2005, Congress acknowledged the Secretary's proposed rule on "Provider Bad Debt" in enacting a reduction in payment to SNF bad debts. Pub. Law 109-171. Section 5004 of the DRA amended section 1861(v)(1) of the Act, 42 U.S.C. § 1395x(v)(1), to state:

> (v) In determining such reasonable costs for skilled nursing facilities with respect to cost reporting periods beginning on or after October 1, 2005, the amount of bad debts otherwise treated as allowable costs which are attributable to the coinsurances amounts under this title for individuals entitled to benefits under part A and —

-12-

(i) are not described in section 1935(c)(6)(A)(ii) shall be reduced by 30 percent of such amount otherwise allowable; and
(ii) are described in such section shall not be reduced.

In the related conference report, Congress specifically acknowledged the Secretary's proposed rule, in which the Secretary explained that bad debts are not payable for services reimbursed under a fee schedule.  House Report 109-362, 109 H. Rpt. 362 (109th Congress, 1st Sess.) (Dec. 19, 2005); *see also* A.R. at 15-16.   Congress was thus clearly aware of the Secretary's rule in which the Secretary reiterates that his policy of reimbursing bad debts is exclusively a feature of a reasonable cost system and does not apply to fee schedules.  If Congress disagreed with the manner in which the Secretary has implemented the BBA, Congress has had ample opportunity to say so, but has not.  Under such circumstances, Congress's silence on the matter should be seen for what it is, a tacit approval of the Secretary's longstanding policy.

III.     The Secretary's Longstanding Policy on Bad Debts is Consistent with Prior Action and Federal Case Law.

The Secretary's longstanding policy is consistent with the law, and the cases cited by Plaintiffs are inapposite.  Plaintiffs incorrectly rely on several cases for the proposition that denying payment for bad debts under the new fee schedule methodology is inconsistent with "the long held position that bad debts arising from services subject to payment under Medicare Part B were subject to reimbursement . . ."  Pls.' Mem. Summ. J. at 14.  However, all of the cited cases deal with services provided *before* the BBA changes to the SNF payment methodology, rendering the cited cases irrelevant to the case currently before the Court, a case which deals exclusively with how bad debts are to be treated under the new prospective payment methodology for SNFs.

In *GCI Health Care Ctrs., Inc.,* 209 F. Supp. 2d 63 (D.D.C. 2002), the plaintiff appealed a

-13-

decision of the Secretary denying payment for bad debts because the provider State was required to reimburse plaintiffs for the debt. Thus, the issue in that case was entirely different than the one before the Court now, and more importantly, the services at issues in *GCI* were rendered in fiscal year 1994, at which time SNFs were still being paid on a *reasonable cost* basis. The Secretary has never disputed that where a reasonable cost methodology is used, bad debts will be reimbursed by Medicare. That, however, is simply not at issue in this case. The law has changed, and SNF therapy services furnished to inpatients not in a covered Part A stay are no longer paid under a reasonable cost methodology. They are paid under a fee schedule, and as such they are not entitled to reimbursement for bad debts. *GCI* simply has nothing to do with the current issue before the Court.

The *St. Luke's* case cited by Plaintiffs is equally irrelevant. *St. Luke's Methodist Hosp. v. Thompson*, 182 F. Supp. 2d 765, 780 (N.D. Iowa 2001), *aff'd* 315 F. 3d 984 (8th Cir. 2003). The *St. Luke's* case had nothing to do with bad debts, and the providers in that case were paid on a reasonable cost basis, not under a fee schedule. In that case, a hospital filed an application with the Secretary seeking reimbursement under 42 C.F.R. § 413.30 for costs incurred above the statutorily-delineated cost limit in providing atypical services to special needs Medicare patients. The Secretary's disallowance in that case was based on a provision of the Medicare Provider Reimbursement Manual ("PRM"), which the court found was inconsistent with the governing regulation at 42 C.F.R. § 413.30. The Court held that the Secretary could not rely on the PRM to disallow SNFs' cost limit exception requests which complied with the regulation itself. *St. Luke's,* 182 F. Supp 2d, at 781. It is hard to see the connection between that case and the one presently before the Court. Nonetheless, Plaintiffs attempt to force a connection by asserting that

-14-

as in *St. Luke's*, "[i]n the instant case, there was no change in the statute or in the governing regulation that supports the notion that bad debts for SNF services payable under the Medicare Part B fee schedule were no longer subject to reimbursement." Pls.' Mem. Summ. J. at 15. To the contrary, there was indeed a significant change to the statute and regulations, of which the Plaintiffs are certainly aware --the BBA-- and the corresponding implementing regulations, which changed the entire mechanism for how SNFs are paid from a reasonable cost system to a prospective payment fee schedule methodology. 42 U.S.C. 1395w-4; 42 C.F.R. 413.1(g)(2) (2000).

Similarly misplaced is Plaintiffs' reliance on *Shalala v. St. Paul-Ramsey Medical Center*, 50 F.3d 522 (8th Cir. 1995). This is yet another case that arose under the old reasonable cost system, and thus can offer no guidance on the case presently before the Court. In the *St. Paul-Ramsey* case, the provider sought reimbursement from Medicare for bad debts. The Secretary disallowed the claim on the ground that the hospital had failed to comply with the Medicare Provider Reimbursement Manual § 312, as it permitted patients to participate in its indigency program without verifying their indigency. The district court held that the Secretary's interpretation of § 312 to require hospitals' independent verification of patient indigency was erroneous. *Id.* at 528. Again, Plaintiffs' attempt to argue that "[a]s was true in *St. Paul-Ramsey*, the Secretary cannot point to any language in the statute, regulations or PRM to support his contention that Medicare providers are not eligible to recover unpaid coinsurance and deductibles . . ." Pls.' Mem. Summ. J. at 16. Plaintiffs further insist that "the applicable provisions of 42 C.F.R. § 413.80 allow the Extendicare Facilities to claim these expenses on their Medicare cost reports . . ." *Id.* But, as noted above, Plaintiffs entire legal theory seems to rest on a

-15-

misapplication of the law, as 42 C.F.R. § 413. 80 is *no longer* the applicable regulation.  Section

413.80 applies only to services paid under a reasonable cost methodology, not to services, such as

those at issue in this case, paid pursuant to the fee schedule as provided for by 42 U.S.C.

1395yy(e)(9); 42 CFR 413.1(g)(2)(ii).  Contrary to Plaintiffs' assertions, the Secretary's policy of

not reimbursing bad debts for services paid pursuant to a fee schedule is supported by all

applicable laws and regulations.  *See id.*  Accordingly, the Court should grant summary judgment

in favor of the Secretary.

IV.    Anti-Cross Subsidization Concerns Are not Implicated Where Payments Are Made
       Pursuant to a Fee Schedule.

By definition, the prohibition on cross-subsidization is a feature of the reasonable cost

system.  In the statutory definition of reasonable cost, Congress instructed the Secretary to

establish a method for determining reasonable costs so that the costs of delivering services to

individuals covered by Medicare would not be borne by individuals not covered by Medicare,  and

the costs of services rendered to individuals not covered by Medicare would not be borne by

Medicare.  42 U.S.C. 1395x(v)(1)(A).  In order to comply with Congress's mandate, Medicare

pays bad debts for services paid under a reasonable cost methodology.  42 C.F.R. §  413.80(d).

A fee schedule inherently eschews the problem of cross-subsidization.  A fee schedule is

designed to provide a pre-determined reimbursement amount that does not vary based on the

actual costs of furnishing the service, recovered or unrecovered.  As the Secretary has explained,

the fee schedule is based on the actual cost of doing business, which in turn accounts for unpaid

deductibles and co-insurance amounts:

> The concept of Medicare bad debt payments applies only to services
> reimbursed on the basis of reasonable cost.  Medicare has never made

-16-

payments to account for bad debts for services paid under a fee schedule or reasonable charge methodology, such as services of physicians or suppliers. Under a fee schedule or reasonable charge methodology, Medicare reimbursement is not based on costs and, therefore, the concept of unrecovered costs is not relevant.  Fee schedules, which are either charge-based or resource-based, relate payments to the price the entity charges. Historically, the prices have reflected the entities cost of doing business, including bad debt.

68 Fed. Reg. 6682, 6683 (Feb. 10, 2003).

Contrary to Plaintiffs' mischaracterizations of the Secretary's policies (*see* Pls.' Mem Summ. J. at 20), the Secretary does not dispute that the anti-cross subsidization principle can indeed apply to Part A as well as Part B. The Secretary does not draw a distinction between Part A and Part B but rather between services paid for under a reasonable cost methodology and those paid for pursuant to a fee schedule.  Because a fee schedule inherently compensates for bad debts, granting providers additional payment for such costs would defeat the purpose of a fee schedule and would effectively constitute a double payment.  Consequently, as the Secretary has repeatedly reaffirmed, the bad debt regulation is not, nor has it ever been, applicable under a fee schedule methodology.  *See e.g.* 68 Fed. Reg. 6682;  71 Fed. Reg. 62,624, 69,712.

V.    The Fee Schedule Is a Prospective Payment System, Under Which Providers are Paid an All-Inclusive Rate, Which Accounts for All of Their Costs, Including Bad Debts.

It has long been Medicare's policy not to pay for bad debts under a fee schedule methodology.  As the Secretary stated in the preamble to the proposed rule on provider bad debt: "[u]nder a fee schedule or reasonable charge methodology, Medicare reimbursement is not based on costs and therefore the concept of unrecovered costs is not relevant. . ."  68 Fed Reg. 6683. With the enactment of the BBA, Congress mandated the implementation of a prospective payment

system for SNFs that covers *all* costs. 42 U.S.C. 1395yy(e)(9).   That is a feature that all

prospective payment systems have in common: they make one prepayment that is designed to

cover all costs. The fee schedule is no exception.

Plaintiffs argue that the fee schedule is a "variation of the prospective payment system

methodology for inpatient services . . . ," and from this, they somehow infer that they should be

reimbursed for bad debts.  Pls.' Mem. Summ. J. at 20-21.  Indeed, a fee schedule is in many ways

similar to inpatient PPS and other prospective payment systems.  In inpatient PPS, like other

prospective payment systems, "the amount of payment per discharge is fixed in advance, is not

based on a hospital's actual costs, and is not subject to retroactive adjustment." *Washington*

*Hospital Center v. Bowen*, 795 F.2d 139, 142 n.2 (D.C. Cir. 1986); *Georgetown University*

*Hospital v. Bowen*, 862 F.2d 323, 324 (D.C. Cir. 1988) (PPS "establishes prospectively fixed rates

that do not vary according to cost in individual cases").  This critical feature of prospective

payment systems- that they provide for reimbursement not to the actual costs a provider incurs to

furnish services- is also an important feature of the fee schedule methodology, as noted above.

But there is also one critical difference between IPPS and the Part B fee schedule.  The

IPPS payment rate is based on hospitals' average costs per discharge in a base period, updated

annually.  *See* 42 U.S.C. § 1395oo(d)(2)(A).  Similarly, the SNF PPS payment rate is based on

facilities' allowable costs in a base period, updated annually.  *See* 42 U.S.C. § 1395yy(e)(4)(A).

But as the Secretary pointed out in his decision, the costs used to construct these payment rates

did not include costs of bad debts.  *See* A.R. at 14.  Thus, Medicare continues to pay for bad debts

related to services provided by providers that are paid under these prospective payment systems.

In contrast, as noted above at length, the Part B fee schedule is based on data reflecting

-18-

what health care providers *charge*, which historically has taken into account the costs of being unable to collect some co-pays and deductibles.  Thus, there is simply no rationale for reimbursing for bad debts related to services paid under a fee schedule, as there is for services paid under a prospective payment system.

Finally, Plaintiffs make the somewhat outrageous assertion that "[t]he regulation provides that the *only* exception for bad debts payable under a fee schedule that are not subject to reimbursement are those of anesthetists."  Pls.' Mem. Summ. J. at 22.  This is a patently false distortion of the Secretary's regulations.  The Secretary has been clear that Medicare does not pay for bad debts under a fee schedule for any services, including, but not limited to, the payment for services rendered by anesthetists.  71 Fed. Reg. 69,624, 69,712 (Dec. 1 2006).  In the preamble to the final rule on bad debts, the Secretary stated that:

> The current bad debt regulation at § 413.89(i) excludes payment of bad debts specifically for those services furnished by anesthetists paid under a fee schedule. In the February 10, 2003 Federal Register , we published the Provider Bad Debt Payment proposed rule where we proposed to amend the language in the existing bad debt regulations to clarify that bad debts are not recognized or reimbursed <u>for all covered services paid for under a reasonable charge-based methodology or a fee schedule</u> (68 FR 6682). As stated in that proposed rule, the proposed amendment was intended to clarify our longstanding policy and is not a change in policy.
>
> In this final rule with comment period, we are finalizing the amendment to the regulations, as proposed in the February 10, 2003 proposed rule, to clarify that payment of bad debts for covered services paid for under a reasonable charge-based methodology or a fee schedule is not allowable.

*Id.* (emphasis added).

Thus, as the Secretary stated in his decision, it has been Medicare's longstanding policy not to pay for bad debts for any services paid for under a fee schedule methodology.  Contrary to Plaintiffs' unsupported contentions, the regulations certainly do not provide that the "only

-19-

exception for bad debts payable under a fee schedule that are not subject to reimbursement are those of anesthetists." Pls.' Mem. Summ. J. at 22.  The regulations that apply the Part B fee schedule, those found in 42 C.F.R., Part 414, do not provide for payment of bad debts for *any* services.  The Secretary's policy of not paying for bad debts under a fee schedule is supported by all applicable law and regulations.

## CONCLUSION

For the foregoing reasons, the Secretary's decision to deny payment for providers' claimed bad debts was reasonable, supported by substantial evidence and consistent with the Medicare statute and regulations.  Accordingly, the Secretary respectfully requests that the Court grant his motion for summary judgment and deny Plaintiffs' motion.

Respectfully submitted,


_____/s/_____
JEFFREY A. TAYLOR
United States Attorney
D.C. Bar No. 498610


_____/s/_____
MEGAN ROSE
Assistant United States Attorney
N.C. Bar No. 28639
Civil Division
555 4th Street, N.W.
Washington, D.C.  20530
(202) 514-7220 / FAX: (202) 514-8780

TRACEY GLOVER
U.S. Department of Health and Human Services
Office of the General Counsel
Centers for Medicare and Medicaid Services
330 Independence Ave., S.W., Room 5309
Washington, D.C. 20201

OF COUNSEL:

DANIEL MERON
General Counsel

JANICE L. HOFFMAN
Acting Associate General Counsel

MARK D. POLSTON
Deputy Associate General
Counsel for Litigation

United States Department of
Health and Human Services

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ABINGTON CREST NURSING AND          )
REHABILITATION CENTER, et al.        )
                                     )
                                     )
          Plaintiffs,                )
                                     )
    v.                               )    Case No. 1:06CV01932 (RJL)
                                     )
MICHAEL O. LEAVITT,                  )
Secretary, United States Department of )
Health and Human Services,           )
                                     )
          Defendant.                 )
_____)

## <u>ORDER</u>

This matter comes before the Court on Cross Motions for Summary Judgment. Based

upon the motions and oppositions thereto, and the entire record herein, it is this _____ day of

_____, 2007 hereby

ORDERED that Plaintiff's motion is DENIED; and it is further

ORDERED that Defendant's motion for summary judgment be, and hereby is,

GRANTED; and it is further

ORDERED that judgement shall be entered for Defendant, and that this matter is hereby

DISMISSED WITH PREJUDICE.

This is a final, appealable order.

SO ORDERED.


                                   _____
                                   RICHARD J. LEON
                                   UNITED STATES DISTRICT JUDGE