# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ABINGTON CREST NURSING AND | ) | |
| REHABILITATION CENTER, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 1:06-CV-01932 (RJL) |
| | ) | |
| MICHAEL O. LEAVITT | ) | |
| Secretary, United States Department of Health | ) | |
| & Human Services, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

# <u>TABLE OF CONTENTS</u>

Page

TABLE OF CONTENTS.............................................................................................. i

TABLE OF AUTHORITIES ..................................................................................... ii

I. PRELIMINARY STATEMENT ..........................................................................1

II. ARGUMENT ........................................................................................................3

    A.    Under 42 C.F.R. § 413.80 as It Existed in 1999, the Facilities are Entitled to Reimbursement of Deductibles and Coinsurance Attributable to Services Provided to Dual Eligibles that are Paid under the Part B Fee  Schedule............3

        1.    Under the Governing Regulation, SNFs are Entitled to Reimbursement of Coinsurance and Deductibles for Services Provided to Dual Eligibles under the Part B Fee Schedule ……………………………………..5

        2.    The BBA of 1997 Did Not Alter SNFs' Right to Reimbursement of Bad Debts for Services Paid under the Part B Fee Schedule …………....6

        3.    The Secretary has Previously Conceded that Congress Did Not Intend that the BBA of 1997 Change Bad Debt Reimbursement Rights for Services Provided to QMBs ...……………………………….……..8

    B.    The Secretary's Policy is Ineffective to Support the Denial of the Facilities' Bad Debt Reimbursement for Services Rendered in 1999 ...……………….…….9

        1.    The Policy Cannot be Applied Retroactively ……..………………….9

        2.    The Policy Rests on a False Premise – that the Secretary has Never Paid Bad Debt Claims for Services Paid According to a Fee Schedule ...10

        3.    Belated Policy Pronouncements Cannot Substitute for Notice and Comment Rulemaking ……..…………………………….…..………12

        4.    The Policy Contravenes Congress' Expressed Intent ……..…………13

    C.    Because the Secretary's Decision is Contrary to the Law and Congressional Intent and is Unsupported by any Evidence, it is Entitled to No Deference under the Administrative Procedure Act .………………………………….…..14

III. CONCLUSION ..................................................................................................15

# TABLE OF AUTHORITIES

**CASES**

*Baltimore Gas & Electric Co. v. Natural Resources Defense Council*,
    462 U.S. 87 (1983)............................................................................................14

*Consolo v. Federal Maritime Commission*,
    383 U.S. 607 (1966)..........................................................................................14

\* *Thomas Jefferson University v. Shalala*,
    512 U.S. 504 (1994)..........................................................................................14

*Harris County Hosp. v. Shalala*,
    64 F.3d 200 (5th Cir. 1995) ...............................................................................3

*Hennepin County Med. Ctr. v. Shalala*,
    81 F.3d 743 (8th Cir. 1996) ................................................................................3

\* *St. Luke's Methodist Hosp. v. Thompson*,
    182 F. Supp. 2d 765 (N.D. Iowa 2001), *aff'd* 315 F.3d 984 (8th Cir. 2003) ...................... 12-13

\* *Shalala v. St. Paul-Ramsey Medical Center*,
    50 F.3d 522 (8th Cir. 1995) .......................................................................... 12-13

\* *GCI Health Care Ctrs., Inc. v. Thompson*,
    209 F. Supp. 2d 63 (D.D.C. 2002).....................................................................5

*Mercy Med. Skilled Nursing Facility v. Thompson*,
    No. CA 99-2765 TPJ, C.A. 01-2014 TPJ, C.A. 02-2252,
    TPJ, 2004 WL 3541332, \*2 (D.D.C. May 14, 2004)............................................15

*Rhode Island Hosp. v. Leavitt*,
    No. CA-006-O5T Medicare & Medicaid Guide (CCH) ........................................10

**STATUTES, RULES & REGULATIONS**

5 U.S.C. § 701 *et seq*.............................................................................................14

\* 42 U.S.C. § 1395x(v)(1) ........................................................................................4

42 U.S.C. § 1395k(a)(2)(F) .....................................................................................11

42 U.S.C. §1395l(i)(2)(A)........................................................................................11

42 U.S.C. § 1395w-4...............................................................................................7

42 U.S.C. § 1396 *et seq*............................................................................................1

ii

42 C.F.R. § 413...................................................................................................................6

42 C.F.R. § 413.1(a)(2)(ii)....................................................................................................6

42 C.F.R. § 413.1(a)(3)..........................................................................................................6

42 C.F.R. § 413.1(g)...............................................................................................................6

42 C.F.R. § 413.13(d)(1)........................................................................................................6

* 42 C.F.R. § 413.80 .....................................................................................................Passim

42 C.F.R. § 413.80(a).............................................................................................................5

42 C.F.R. § 413.80(b) ............................................................................................................5

42 C.F.R. § 413.80(d)............................................................................................................5

42 C.F.R. § 413.80(e)............................................................................................................5

42 C.F.R. § 413.89........................................................................................................Passim

42 C.F.R. § 413.337 .............................................................................................................6, 7

42 C.F.R. § 414 ....................................................................................................................4-6

42 C.F.R. § 414.22 ..................................................................................................................7

* Balanced Budget Act of 1997, Pub. L. No. 105-33, 111 Stat. 251 ...................................Passim

Deficit Reduction Act of 2005, Pub. L. No. 109-171, § 5004, 120 Stat. 4, 32 ................ 2-3, 7, 13

Omnibus Budget Reconciliation Act of 1986, Pub. L. No. 99-509 ........................................... 11

**MANUALS**

PRM § 300 ..........................................................................................................................13

PRM § 312 ..........................................................................................................................13

PRM § 322 ..........................................................................................................................13

PRM § 334.2 .......................................................................................................................13

CMS General Information, Eligibility and Entitlement Manual, PUB. 100-01,
Transmittal No. 11 (Oct. 22, 2004)..................................................................................... 11-12

HCFA Program Memorandum, Transmittal No. A-97-19 (Jan. 1998).......................................2, 9

HCFA Program Memorandum, Transmittal No. A-98-18 (June 1998)............................. 2, 8-9, 13

**OTHER AUTHORITIES**

52 Fed. Reg. 36,765, 36,771-72 (Oct. 1, 1987) ...................................................................11

63 Fed. Reg. 40,954, 40,985-86 (July 31, 1998) ................................................................12

68 Fed. Reg. 6682, 6683-87 (Feb. 10, 2003) ................................................................2, 10

71 Fed. Reg. 6991 (Feb. 10, 2006) ......................................................................................3

71 Fed. Reg. 69,624 (Dec. 1, 2006) .....................................................................................6

71 Fed. Reg. 69,785 (Dec. 1, 2006) ................................................................................6, 10

## I.  __PRELIMINARY STATEMENT__

The Secretary's long-standing hostility toward reimbursement of the bad debts Medicare providers incur in rendering services to Medicare program beneficiaries and, in particular, uncollectible coinsurance and deductibles arising from services provided to Qualified Medicare Beneficiaries ("QMBs") is well documented -- as is Congress' intent that provider bad debts arising from services to QMBs, like those at issue here, be reimbursed by Medicare.  However, contrary to the Secretary's contention, his purported policy of denying reimbursement of bad debts arising from services paid for under a fee schedule is not long-standing and it has not been applied consistently.  To the contrary, that policy is simply the Secretary's most recent effort to avoid his obligation to reimburse bad debts arising from services provided to QMBs, as mandated by 42 C.F.R. § 413.80 (now 42 C.F.R. § 413.89)[1] and related provisions of the Provider Reimbursement Manual ("PRM").

A prime example can be found in the Secretary's interpretation of another provision of the Balanced Budget Act of 1997 ("BBA of 1997"), Pub. L. No. 105-33, 111 Stat. 251.  Therein, Congress amended the statutes governing the Medical Assistance program (42 U.S.C. § 1396 *et seq.*) to provide that state Medicaid programs were no longer required to make any payment for Medicare deductibles or coinsurance for QMBs, to the extent that such a payment would exceed a state's Medicaid program payment for the services rendered.  BBA of 1997 at § 4714.  The relevant language stated, " . . . [t]he amount of payment made under Title XVIII plus the amount of payment (if any) under the State plan shall be considered to be payment in full for the service . . . ."  *Id.*

---

[1]  Since 42 C.F.R. § 413.80 was the governing regulation at the relevant time period and the Secretary's brief cites to 42 C.F.R. § 413.80, this reply and responsive memorandum will refer to 42 C.F.R. § 413.80, as well.

The Health Care Financing Administration ("HCFA")[2] took that opportunity to opine that the term "payment in full" was meant to *entirely* eliminate bad debt reimbursement of deductibles and coinsurance arising from services provided to QMBs.  HCFA Program Memorandum, Transmittal No. A-97-19 (Jan. 1998).  Several months later, on June 1, 1998, HCFA reversed itself and abandoned its effort to eliminate bad debt reimbursement for services provided to QMBs through its interpretation of this provision of the BBA of 1997.  Specifically, HCFA acknowledged that Congress did *not* intend to limit bad debt reimbursement arising out of services provided to QMBs in the BBA of 1997, and that providers could continue to claim, as Medicare bad debt, uncollectible coinsurance and deductibles arising from those services. HCFA Program Memorandum, Transmittal No. A-98-18 (June 1998).

Having failed in his effort to avoid bad debt reimbursement for QMB services through the discredited interpretation of § 4714 of the BBA of 1997, the Secretary now takes a different tack:  He has interpreted another provision of the BBA of 1997 to allow him to effectively reach the same result with regard to SNFs Part B services.  The Secretary reasons that, when the BBA of 1997 adopted the Part B fee schedule as the payment mechanism for some SNF services, it implicitly prohibited bad debt reimbursement for such services.  The Secretary first published this "policy" of no bad debt claims for services paid under a fee schedule in 2003, when he published a notice of proposed rulemaking to amend 42 C.F.R. § 413.89 so as to eliminate bad debt reimbursement for services paid on a fee schedule.  68 Fed. Reg. 6682, 6683-87 (Feb. 10, 2003).  Since then, Congress has again spoken on the subject of bad debt reimbursement.  In the Deficit Reduction Act of 2005 ("DRA"), Congress amended the Medicare Act to limit SNF's bad debt reimbursement arising from Part A services provided, but Congress specifically

---

[2]    The Health Care Financing Administration is now known as the Centers for Medicare & Medicaid Services ("CMS").

exempted services rendered to dual eligible beneficiaries from the limitation it imposed.  Pub. L. No. 109-171, § 5004, 120 Stat. 4, 32.  See 71 Fed. Reg. 6991 (Feb. 10, 2006).[3]

The Secretary's continuing efforts to interpret away SNFs' entitlement to bad debt reimbursement for Part B services provided to QMBs in 1999 without commencing, much less completing, notice and comment rulemaking to effectuate such a change must be rejected.  The Secretary's "policy," which was not published until years after the 1999 fiscal year here involved and rests on the false premise of consistent rejection of bad debt claims arising out of services rendered that were paid according to a fee schedule, must give way to the clear language of the governing regulation and Congress' acknowledged intent that the BBA of 1997 did not alter Medicare providers' bad debt reimbursement rights.

Accordingly, consistent with the decision of the Provider Reimbursement Review Board ("PRRB") that the Secretary reversed, the Extendicare Facilities are entitled to reimbursement of bad debts arising from therapy services rendered to dual eligibles that are paid under a Part B fee schedule during their 1999 fiscal year.

## ARGUMENT

    **A.**    **Under 42 C.F.R. § 413.80 as It Existed in 1999, the Facilities are Entitled to Reimbursement of Deductibles and Coinsurance Attributable to Services Provided to Dual Eligibles that are Paid under the Part B Fee Schedule.**

As a threshold matter, it must be noted that the Secretary does not contest that the Extendicare Facilities lost revenue because they were unable to collect the Medicare mandated coinsurance and deductibles from dual eligible beneficiaries that are at issue in this case.  Indeed,

---

[3]    For another example of the Secretary's resistance to payment of bad debt claims, see, e.g., *Hennepin County Med. Ctr. v. Shalala*, 81 F.3d 743 (8th Cir. 1996) and *Harris County Hosp. v. Shalala*, 64 F.3d 200 (5th Cir. 1995).  Both cases describe the Secretary's systematic reduction in reimbursement of providers' bad debt claims in the 1980s.  In fact, the Office of Inspector General of the Department of Health and Human Services even proposed eliminating bad debt reimbursement entirely.  Ultimately, Congress stepped in and enacted a moratorium, wherein it prohibited the Secretary and his agents from imposing standards and limitations for reimbursement of bad debt claims that had not been in place prior to August 1, 1987.  *Id.*

the Secretary conceded before the PRRB that the Extendicare Facilities have met all criteria set forth in 42 C.F.R. § 413.80 for reimbursement of uncollectible deductibles and coinsurance for services provided to dual eligibles for the services payable under the Part B fee schedule.  And, he does not dispute that, prior to enactment of the BBA of 1997, the Facilities claimed, and were compensated for, unpaid deductibles and coinsurance reported on their Medicare cost reports for both Part A and Part B services rendered to dually eligible beneficiaries – or that CMS has continued to reimburse uncollectible deductibles and coinsurance arising out of services to dual eligibles that are paid for under the prospective payment system for SNF services covered under Part A that Congress adopted as another element of the BBA of 1997.

Rather, the Secretary asserts that, because the bad debt reimbursement and anti-cross subsidization rationale are addressed in 42 C.F.R. § 413.80 and regulations governing the fee schedule methodology for SNF Part B services set forth in 42 C.F.R. § 414 are silent as to bad debt, "bad debts are a feature of a reasonable cost system."  (Sec'y Br. at 10.)  Thus he concludes that bad debt reimbursement is not available where payment methodologies other than reasonable cost, such as fee schedules, are used.  (*Id*.)  He further concludes that, when Congress enacted the BBA of 1997 and changed the payment basis for SNF Part B services from lesser of cost or charges to lesser of fee schedule or charges, it "implicitly" took uncollectible deductibles and coinsurance arising from services provided to dual eligibles under Part B outside the scope of 42 U.S.C. § 1395x(v)(1).  (*Id*. at 12.)  Consequently, according to the Secretary, such uncollectible deductibles and coinsurance for cost periods beginning on or after July 1, 1998 "categorically failed to qualify" for bad debt reimbursement.  (*Id*. at 11.)  The Secretary's contentions ignore the express language of the regulation, defy basic logic, are internally inconsistent, and are contradicted by the Secretary's conduct and admissions with regard to his administration of the Medicare program.

4

      1.    <u>Under the Governing Regulation, SNFs are Entitled to Reimbursement of Coinsurance and Deductibles for Services Provided to Dual Eligibles under the Part B Fee Schedule.</u>

Under 42 C.F.R. § 413.80, bad debts are not "costs" but, "deductions from revenue, that are created or acquired in providing services."  42 C.F.R. § 413.80(a) and (b).  Moreover, 42 C.F.R. § 413.80 expressly states that deductions from revenue, including bad debts, "are reimbursable *under the program*."  42 C.F.R. § 413.80(a) (emphasis added).  "The program" clearly includes all services SNFs provide, regardless of whether payment is made under a Part B fee schedule or a prospective payment system for services covered under Part A.  There is no limitation as to payment methodology in § 413.80(d); the reasonable cost basis methodology is not included as a precondition or criterion for bad debt in § 413.80(e); and, under subsection (i) of § 413.80, the only services expressly excepted from bad debt reimbursement on the basis of fee schedule payment are anesthetists services.  <u>See</u> *GCI Health Care Ctrs., Inc. v. Thompson*, 209 F. Supp. 2d 63 (D.D.C. 2002) (confirming that 42 C.F.R. § 413.80 and the PRM expressly provide for reimbursement of Part B deductibles and coinsurance amounts without regard to the payment methodology and that the only providers whose bad debt reimbursement is restricted with respect to payment under a fee schedule are anesthetists).[4]

While it is true that the regulations governing reimbursement of SNF services paid under the Part B fee schedule are found in 42 C.F.R. § 414 (Sec'y Br. at 10), that section is silent with respect to the matter of bad debts.  The Secretary makes much of the change from the prior

---

[4]   The Secretary criticizes the Facilities' citation to *GCI Health Care Ctrs., Inc.*, 209 F. Supp. 2d 63 because it predated adoption of the fee schedule payment methodology for SNF Part B services.  This criticism is misplaced.  *GCI* is cited only for the proposition that under 42 C.F.R. § 413.80 and relevant provisions of the PRM, Part B deductibles and coinsurance amounts were reimbursable under the Medicare program.  209 F. Supp. 2d at 66.  Nowhere have the Facilities suggested that *GCI* specifically addresses the Secretary's more recent rationale that the BBA of 1997 eliminated bad debt reimbursement for SNF services provided under a Part B fee schedule because payment under a fee schedule is inherently incompatible with bad debt reimbursement.

payment system for Part B services, wherein SNFs received the lower of their costs or charges to the lower of the fee schedule or their charges. However, the Secretary's analysis ignores the fact that bad debts have *always been excluded* from costs. 42 C.F.R. § 413.13(d)(1). Moreover, both of the SNF payment mechanisms, Part A PPS and the Part B fee schedule, continue to be referenced in and subject to the provisions of § 413. See, e.g., 42 C.F.R. §§ 413.1(a)(2)(ii); 413.1(a)(3); 413.1(g) and 413.337.

Given the express and broadly worded bad debt reimbursement language of § 413.80, its express exception of bad debt reimbursement of anesthetists paid under a fee schedule and the absence of language eliminating -- or even reducing -- bad debt reimbursement of SNFs, the Secretary's contention that the court should "infer" from the BBA of 1997's "switch" to a Part B fee schedule that Congress intended to eliminate bad debt reimbursement for such services is unreasonable. Indeed, if, as the Secretary contends, the BBA of 1997 implicitly eliminated reimbursement for bad debt arising from services provided under a fee schedule, there would be no reason for the Secretary's belated amendment to 42 C.F.R. § 413.89, which does precisely that. 71 Fed. Reg. 69,624, 69,785 (Dec. 1, 2006).[5]

> 2. The BBA of 1997 Did Not Alter SNFs' Right to Reimbursement of Bad Debts for Services Paid under the Part B Fee Schedule.

The Secretary argues that "[b]y switching SNFs from the reasonable cost payment methodology to the prospective payment fee schedule, Congress has indicated its intention that SNFs no longer partake of any aspect of reasonable cost payment." (Sec'y Br. at 12.) This is not true. In fact, the Secretary admits that, despite the "switch" from a reasonable cost system to a prospective payment system for SNF services covered under Part A, CMS continues to reimburse bad debts attributable to those Part A SNF services. (*Id.* ("Medicare still reimburses

---

[5]    Further, if, as the Secretary argues, the controlling regulations are included in 42 C.F.R. § 414, he should have amended § 414, not § 413.89.

SNFs for the costs of bad debts for services not paid under the fee schedule."))  Indeed, the

Secretary did not reduce the bad debt payments for SNF services paid under the Part A

prospective payment system until enactment of the DRA.

Moreover, as noted in the Extendicare Facilities' opening brief, there is no meaningful

distinction between the prospective payment system methodology employed under Part A of the

Medicare program and a fee schedule methodology applied to pay for services under Part B of

the program.  Both methodologies involve payment of a pre-determined amount that does not

reflect the actual costs incurred by an individual provider in delivering a particular service.

Nonetheless, in each case, the bases for determination of payment are derived from costs.  See 42

C.F.R. § 413.337(a) (SNF Part A PPS payments derived from historical costs; and 42 U.S.C. §

1395w-4(e)) and 42 C.F.R. § 414.22 (the Secretary is required to determine fee schedule

payments that are derived from cost data as well).

The Secretary concedes as much in describing the similarities between the prospective

payment and fee schedule methodologies.  (Sec'y Br. at 18-19.)  The Secretary notes that

prospective payment rates are based on "allowable costs in a base period, updated annually," and

that Part B fee schedules are based on data reflecting what health care providers charge which

charges, in turn, take costs into account.  (Id.)  Despite this, the Secretary maintains, without

offering a rational explanation, that fee schedule payments are somehow different from PPS

payments, and the Secretary is relieved of his obligation to reimburse the lost revenue associated

with such services rendered to dual eligible beneficiaries.

The Secretary argues that, while prospective payment rates do not include bad debt, data

supporting charges used in calculating fee schedules have "historically taken bad debt into

account."  However, as the components taken into account when setting the physician's fee

schedule make clear, this is not true.  See 42 U.S.C. § 1395w-4; Plfs' Mem. at 22.  In fact, the

only "authority" cited in support of this proposition is the Secretary's bald statement to that effect in the decision under review and the Secretary's 2003 comment in support of the proposed amendment to 42 C.F.R. § 413.89.  Clearly, neither the Secretary's comment made years after the 1999 fiscal year here involved, nor an unsubstantiated statement in the final administrative decision under review, constitutes meaningful authority for the contention that fee schedules take bad debt into account or otherwise explains why, if payment methodology was the controlling factor, bad debts would be reimbursed where a prospective payment system applies but not where a fee schedule applies.  It follows that if, as the Secretary contends, "switching SNFs from the reasonable cost payment methodology to the prospective system/fee schedule" reflects Congress' intent "that SNFs no longer partake of any aspect of reasonable cost payment" (Sec'y Br. at 12), the Secretary would have eliminated bad debt reimbursement for services paid under the Part A prospective payment system, as well.

> 3.  <u>The Secretary has Previously Conceded that Congress Did Not Intend that the BBA of 1997 Change Bad Debt Reimbursement Rights for Services Provided to QMBs</u>.

It is inappropriate for the Secretary to infer that the intent of Congress was to allow him to reduce reimbursement of SNF Part B bad debt arising from services provided to dual eligibles when it enacted the BBA of 1997.  This is because, as HCFA acknowledged in 1998, Congress' intent in enacting the BBA of 1997 was to the contrary.  On June 1, 1998, approximately ten months after the BBA of 1997 became effective, HCFA issued Program Memorandum A-98-18, wherein it acknowledged that it was Congress' intent that the BBA of 1997 *not* alter providers' entitlement to reimbursement of bad debts relating to services provided to QMBs:

> SUBJECT:  REVISED MEDICARE BAD DEBT TREATMENT FOR QUALIFIED MEDICARE BENEFICIARIES
>
> This Program Memorandum is being issued to correct a misinterpretation of Congressional intent regarding the proper treatment of Medicare bad debts for Qualified Medicare

beneficiaries (QMBs). The original interpretation was addressed in a Program Memorandum, Transmittal No. A-97-19, dated January 1998.

The language in § 4714(a) of the Balanced Budget Act of 1997 (BBA) states, in pertinent part, ". . . The amount of payment made under title XVIII plus the amount of payment (if any) under the State plan shall be considered to be *payment in full* for the service; . . ." (emphasis in original). *The Health Care Financing Administration initially interpreted the specific phrase "payment in full" to mean that there would be no amounts to be claimed as Medicare bad debts.*

*Upon further examination of the legislative history, we concluded that Congress had not intended to address this issue* and that the language in § 4714(a) of the BBA did not preclude the Medicare program from recognizing the unpaid QMBs' cost-sharing as Medicare bad debt. *Therefore, effective on the date of enactment of the BBA (August 5, 1997), in states where Medicaid does not fully pay for QMBs' cost-sharing, providers may claim the difference as a bad debt for purposes of Medicare payment.*

We regret any inconvenience or confusion Transmittal No. A-97-19 may have caused.

Medicare & Medicaid Guide (CCH) [1998-1 Transfer Binder] ¶ 46,321 (emphasis added); see 9

Medicare Rep. (BNA) 373 (Regulatory News Apr. 10, 1998).

### B. The Secretary's Policy is Ineffective to Support the Denial of the Facilities' Bad Debt Reimbursement for Services Rendered in 1999.

#### 1. The Policy Cannot be Applied Retroactively.

A theme that permeates the Secretary's brief is that CMS has a "longstanding" policy "implicitly" approved by Congress of not reimbursing bad debts paid under a fee schedule. (Sec'y Br. at 2, 7, 8, 12, 13, 16, 17, 19.) The Secretary's contentions in this regard are flawed.

One obvious problem is that this case concerns bad debts included in cost reports submitted for the Facilities' 1999 fiscal year. Yet there is absolutely nothing in the administrative or legislative record to support the contention that, as of the cost year here at issue, CMS had articulated any such policy. Indeed, the only authority the Secretary can muster

to support its alleged "longstanding" policy are comments made by the Secretary in February

2003, when he commenced the rule making process in connection with the revision of 42 C.F.R.

§ 413.89 that added subsection (i) (specifically excepting from reimbursement "bad debts arising

from covered services paid under a reasonable charge/methodology or a fee schedule"), and the

Secretary's subsequent comments included in the preamble to the finalized rule, which became

effective January 1, 2007.  68 Fed. Reg. at 6683; 71 Fed. Reg. at 69,785.  (Sec'y Br. at 16-17.)

        A purported administrative policy that is not articulated until the Secretary proposes to

change the applicable regulation four years after the cost year at issue -- and that is not

implemented by publishing a final amendment to the regulation until nearly four years after that -

- cannot be applied retroactively to deprive providers of reimbursement rights specified in the

regulation as it existed at the time services were rendered.  This is true without regard to the

Secretary's 2003 comment that the amendment is simply a clarification of existing policy.

*Rhode Island Hosp. v. Leavitt*, No. CA-006-O5T Medicare & Medicaid Guide (CCH) ¶ 302,168

(D.R.I. Aug. 9, 2007)  ("If, as the Secretary contends, the amendment merely 'clarifies' what the

Regulation already said, it adds nothing to the analysis.  On the other hand, if the amendment

imposes a new requirement . . . , it cannot be applied retroactively.").  It is also true without

regard to whether or not Congress was aware of the Secretary's "policy" at the time it

implemented legislative changes six years after the cost year involved.  (Sec'y Br. at 12, 13.)

        2.      The Policy Rests on a False Premise – that the Secretary has Never Paid
                Bad Debt Claims for Services Paid According to a Fee Schedule.

        The Secretary's February 2003 statement upon which he relies to support his purported

policy -- that "Medicare has never made payments to account for bad debts for services paid

under a fee schedule or reasonable charge methodology, such as services of physicians or

suppliers," -- is not true.  68 Fed. Reg. at 6683.  The facility component of services provided by

ambulatory surgical centers ("ASCs"), have been paid according to a fee schedule for twenty

years.  See, e.g., 42 U.S.C. §§ 1395k(a)(2)(F) and 1395l(i)(2)(A); CMS General Information,

Eligibility and Entitlement Manual, PUB. 100-01, Transmittal No. 11 (Oct. 22, 2004).[6]  An

examination of the Secretary's pronouncements regarding the bad debts arising from ASC

services paid under a fee schedule demonstrates that such bad debts have been reimbursed under

the Medicare program.

Section 9343(e) of the Omnibus Budget Reconciliation Act ("OBRA") of 1986 (Pub. L.

No. 99-509), as amended by § 4085(i)(21)(D) of OBRA 1987, mandated that Medicare

beneficiaries begin paying deductibles and coinsurance for ASC services.  See CMS General

Information, Eligibility and Entitlement Manual, PUB. 100-01, Transmittal No. 11 (Oct. 22,

2004).  When it implemented this legislation, HCFA assured providers that, if the requirements

of 42 C.F.R. § 413.80 were met, it *would* reimburse the uncollectible Medicare bad debt it incurs

related to provision of covered ambulatory surgical services:

> In the past, beneficiaries were not liable for Medicare Part B
> deductible and coinsurance amounts for ASC facility services, but
> they were liable for deductible and coinsurance amounts for
> hospital outpatient services.  However, section 9343(e) of Pub. L.
> 99-509 provides that, effective July 1, 1987, coinsurance and
> deductibles are to apply to ASC facility services, too.  Thus, for
> services furnished in either an ASC or a hospital outpatient
> department on or after July 1, 1987, a beneficiary will be liable for
> up to $75 of any unmet deductible obligation, plus 20 percent of
> either the applicable ASC facility rate or the hospital's customary
> charge. (If a hospital meets the collection effort requirements of
> our regulations at § 413.80, we will reimburse the hospital for the
> uncollectible Medicare bad debts it incurs related to provision of
> covered ambulatory surgical services.)

52 Fed. Reg. 36,765, 36,771-72 (Oct. 1, 1987).

---

[6]   In relevant part the Secretary's Manual states:  "**B.  Policy:**  On or after July 1, 1987, for procedures
on the ASC list furnished to beneficiaries in an ASC, the Medicare program pays 80% of the
applicable ASC fee schedule amount for ASC facility services.  After the beneficiary's deductible is
met, the beneficiary is responsible for 20% of the applicable ASC fee schedule amount for ASC
facility services."

More recently, the Secretary responded to comments regarding the effect of another provision of the BBA of 1997, which limited hospitals bad debt claims. One comment questioned the impact on the Congressional limitation on hospital bad debt claims on bad debt reimbursement to hospital-based skilled nursing facilities. The Secretary took that opportunity to reiterate that ASCs are paid on a fee schedule basis and, thus, are entitled to reimbursement of bad debt regardless of the limitation imposed on hospitals:

> The HCFA 2252-96 hospital cost report forms do not apply the reduction in bad debt reimbursement to hospital-based skilled nursing facilities . . . Cost reports for skilled nursing facilities, home health agencies, outpatient therapy, comprehensive outpatient rehabilitation facilities, community mental health centers, federally qualified health centers, and rural health clinics (after January 1, 1998) are separately settled and bad debts for these providers are not reduced. *The bad debt reduction does not apply to ambulatory surgical centers because they are paid on another basis (fee schedule).* End stage renal disease bad debts are computed separately and are not reduced.

63 Fed. Reg. 40,954, 40,985-86 (July 31, 1998) (emphasis added).

Thus, the notion that fee schedule payments have never been a source of Medicare reimbursed bad debt claims is simply not true.

    3.    <u>Belated Policy Pronouncements Cannot  Substitute for Notice and Comment Rulemaking</u>.

The Secretary faults the Facilities' citation to *St. Luke's Methodist Hosp. v. Thompson*, 182 F. Supp. 2d 765, 780-783 (N.D. Iowa 2001), *aff'd* 315 F.3d 984 (8th Cir. 2003) and *Shalala v. St. Paul-Ramsey Medical Center*, 50 F.3d 522 (8th Cir. 1995). He asserts that the cases are irrelevant as they have nothing to do with bad debts and the providers therein were paid on a reasonable cost basis, not under a fee schedule. (Sec'y Br. at 14-16.) The Secretary misses the point.

As is readily apparent, the Facilities do not suggest that these cases deal with bad debt claims arising under a fee schedule payment methodology.  Nonetheless, the cases demonstrate that, in the absence of a change in the governing regulation, the Secretary's adoption of an interpretation or policy inconsistent with the regulation without engaging in notice and comment rulemaking is inappropriate and will not be given effect.  Just as the Secretary in *St. Luke's* and *St. Paul-Ramsey* could not point to language in the governing regulation to support his position and relied instead on "interpretation," here the Secretary cannot point to any language in the BBA of 1997 or the governing regulation (or even the PRM), to support his policy that Medicare providers are not eligible to recover unpaid coinsurance and deductibles for services rendered during the 1999 cost year that were payable under a fee schedule.  Moreover, such policy contradicts the language of 42 C.F.R. § 413.80, which expressly allows the Facilities to claim these expenses as bad debt on their Medicare cost reports.  Under the holdings of  *St. Luke's* and *St. Paul-Ramsey*, the governing regulation must trump the Secretary's purported policy.

4.    The Policy Contravenes Congress' Expressed Intent.

As noted above, HCFA's June 1, 1998 Program Memorandum No. A-98-18 conceded that Congress did not intend that the BBA of 1997 would diminish providers' bad debt reimbursement rights arising from services provided to QMBs.  Accordingly, the Secretary's purported policy of denying all bad debt reimbursement for services paid under a fee schedule contradicts Congress' intent in enacting the BBA of 1997.  More recently, Congress specifically exempted dual eligible beneficiaries from the limitation imposed on other SNF bad debt claims when it enacted the DRA.  Of course, the Secretary's policy is also inconsistent with the language of 42 C.F.R. § 413.80 and relevant provisions of the PRM, §§ 300, 312, 322, and 334.2.  Under these circumstances, the Secretary's purported policy carries no weight.

13

C.     **Because the Secretary's Decision is Contrary to the Law and Congressional Intent and is Unsupported by Any Evidence, it is Entitled to No Deference under the Administrative Procedure Act.**

The Secretary asserts that, under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*., the scope of judicial review of Medicare provider reimbursement decisions is narrow and that, under the circumstances of this case, the court should give "broad deference" to the Secretary's interpretation.  (Sec'y Br. at 10.)  However, as the case law cited by the Secretary makes clear, such deference is inappropriate where the agency's decision is outside the "bounds of reason," *Baltimore Gas & Electric Co. v. Natural Resources Defense Council*, 462 U.S. 87, 105 (1983), unsupported by relevant evidence that a "reasonable mind might accept as adequate to support a conclusion," *Consolo v. Federal Maritime Commission*, 383 U.S. 607, 619-20 (1966) (citation omitted), or "an alternative reading is compelled by the regulation's plain language or other indications of the Secretary's intent at the time of the regulation's promulgation," *Thomas Jefferson University v. Shalala*, 512 U.S. 504, 512 (1994) (citation omitted).

Moreover, even if the regulation were ambiguous, thus opening the door to interpretation, deference accorded the agency's decision is not unlimited.  *Id*. at 525 ("deference ordinarily accorded an agency's interpretation of an ambiguous regulation, however reasonable that interpretation might be, should not be construed as sanctioning the promulgation of vaguely or imprecisely worded regulations that confer carte blanche on the agency to make up the law as it goes along, and thereby, allow the agency to circumvent the rulemaking process").

As the foregoing discussion indicates, the Secretary's decision in this instance exhibits all of the attributes of a decision entitled to no deference.  The decision is contrary to the plain language of 42 C.F.R. § 413.80; it is without support in the language of any other statute or regulation; it is inconsistent with the Secretary's prior conduct regarding bad debt claims arising

under fee schedule payment methodologies, and it rests on an inference that is refuted by the Secretary's own acknowledgement of Congress' intent in enacting the BBA of 1997. Moreover, the Secretary's reliance on a purported policy articulated years after the cost year here involved is outside the bounds of reasoned decision making and devoid of legitimate evidentiary support. Indeed, the fact that the Secretary has taken steps to amend the regulation so as to expressly provide that bad debts arising from covered services paid under a reasonable charge-based methodology or a fee schedule are not subject to reimbursement under the Medicare program confirms that the regulation, as it existed before its amendment, could not reasonably be interpreted as the Secretary has found. Thus, the Secretary's interpretation of his own regulation "constitutes a change in the Secretary's definitive interpretation made without following the required notice-and-comment procedures" in violation of the APA. *Mercy Med. Skilled Nursing Facility v. Thompson*, No. CA 99-2765 TPJ, C.A. 01-2014 TPJ, C.A. 02-2252 TPJ, 2004 WL 3541332, *2 (D.D.C. May 14, 2004) (unpublished).

## CONCLUSION

Contrary to the Secretary's contentions, 42 C.F.R. § 413.80 is the applicable regulation and its provision for bad debt reimbursement encompasses bad debts attributable to services payable under the Part B fee schedule. Further, Congress has made it clear that SNFs are entitled to be reimbursed for unpaid deductibles and coinsurance arising from the provision of services to QMBs, including Part B services, and the BBA of 1997 did not alter that entitlement. Under these circumstances, the Secretary's belatedly-published policy, that rests on a false premise and contravenes Congress' intent, is ineffective to alter the Facilities' Medicare reimbursement rights. Accordingly, until the Secretary, following required notice and comment rulemaking procedures, formally adopted the amendment to 42 C.F.R. § 413.89, SNFs were entitled to

reimbursement of uncollectible Part B coinsurance and deductibles attributable to services

provided to dual eligibles under a Part B fee schedule.

For all of the foregoing reasons, as well as the reasons set forth in the Extendicare

Facilities' opening brief, the Extendicare Facilities respectfully request that the Court grant their

Motion for Summary Judgment, deny the Secretary's Motion for Summary Judgment, reverse

the Secretary's decision, and hold, consistent with the decision of the PRRB, that the Facilities

were entitled to reimbursement of bad debts arising from therapy services rendered to dually-

eligible Medicare/Medicaid beneficiaries that were paid under the Part B fee schedule.

Respectfully submitted,


/s/  John R. Jacob_____
John R. Jacob
D.C. Bar No. 444412
AKIN GUMP STRAUSS HAUER & FELD LLP
Robert S. Srauss Building
1333 New Hampshire Avenue, NW
Washington, D.C. 20036
Telephone:  202-887-4582
Fax:  202-955-7648
Email:  jjacob@akingump.com


OF COUNSEL:
Daniel F. Miller
Barbara J. Janaszek
WHYTE HIRSCHBOECK DUDEK S.C.
555 E. Wells Street
Suite 1900
Milwaukee, WI 53202-3819
Telephone:  414-273-2100
Fax:  414-223-5000
Email:  dmiller@whdlaw.com
Email:  bjanaszek@whdlaw.com


Attorneys for Plaintiffs


Dated:  September 14, 2007

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ABINGTON CREST NURSING AND REHABILITATION CENTER, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 1:06-CV-01932 (RJL) |
| MICHAEL O. LEAVITT Secretary, United States Department of Health & Human Services, | ) ) ) ) | |
| Defendant. | ) ) ) | |

## PLAINTIFFS' CONCISE STATEMENT OF GENUINE ISSUES

Plaintiffs, Abington Crest Nursing and Rehabilitation Center, *et al* (the "Plaintiffs"), hereby respond to Defendant's Rule 7(h) Statement of Material Facts as to Which There is No Genuine Issue ("Defendant's Statement"), in accordance with Rules 56 of the Federal Rules of Civil Procedure and Local Rules 7(h) and 56.

Plaintiffs aver that, to the extent that the parties disagree as to any of the facts underlying the present action, those disagreements are not material. There are no triable issues of fact.

Further, responding specifically to the numbered paragraphs of Defendant's Statement, and using the same paragraph numbering, Plaintiffs respond to the following specific assertions in Defendant's Statement:

Plaintiffs agree with paragraphs 1-5 and 11-20 of the Defendant's Statement.

The allegations in paragraphs 6, 8, 9 and 10 of Defendant's Statement contain legal conclusions and characterizations of this action, various documents in the record, various legal authorities and administrative decisions, not undisputed facts.

Plaintiffs deny Defendant's characterization of 42 C.F.R. § 413.80 in paragraph 7 of

Defendant's Statement as an incomplete and inaccurate interpretation of the regulation.

Respectfully submitted:

/s/  John R. Jacob_____
John R. Jacob
D.C. Bar No. 444412
AKIN GUMP STRAUSS HAUER & FELD LLP
Robert S. Srauss Building
1333 New Hampshire Avenue, NW
Washington, D.C. 20036
Telephone:  202-887-4582
Fax:  202-955-7648
Email:  jjacob@akingump.com


OF COUNSEL:
Daniel F. Miller
Barbara J. Janaszek
WHYTE HIRSCHBOECK DUDEK S.C.
555 E. Wells Street
Suite 1900
Milwaukee, WI 53202-3819
Telephone:  414-273-2100
Fax:  414-223-5000
Email:  dmiller@whdlaw.com
Email:  bjanaszek@whdlaw.com

Attorneys for Plaintiffs


Dated: September 14, 2007

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| ABINGTON CREST NURSING AND<br>REHABILITATION CENTER, *et al.*,     ) | |
| ) | |
| Plaintiffs,     ) | |
| ) | Civil Action No. 1:06-CV-01932 (RJL) |
| v.     ) | |
| ) | |
| MICHAEL O. LEAVITT     ) | |
| Secretary, United States Department of Health     ) | |
| & Human Services,     ) | |
| ) | |
| Defendant.     ) | |

_____)

## [PROPOSED] ORDER

Upon consideration of the Plaintiffs' Motion for Summary Judgment, and the

Defendant's Cross-Motion for Summary Judgment, and the entire record herein, it is hereby

ORDERED that, as to Plaintiffs' Motion for Summary Judgment, the Court finds

that the material facts are not in dispute and that judgment should enter for Plaintiffs as a matter

of law, and it is therefore ORDERED that the Plaintiffs' Motion for Summary Judgment be and

hereby is GRANTED, and it is further ORDERED that the Defendant's Cross-Motion for

Summary Judgment be and hereby is DENIED.


Date:_____                    _____

                                         United States District Judge