IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ABINGTON CREST NURSING AND REHABILITATION CENTER, et al.<br><br>Plaintiffs,<br><br>v.<br><br>MICHAEL O. LEAVITT,<br>Secretary, United States Department of Health and Human Services,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>) Case No. 1:06CV01932 (JDB)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DEFENDANT'S REPLY TO PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT**

The Secretary has argued before the Court and has stated many times over the years, that under a payment system based on a fee schedule, the Secretary does not reimburse providers for bad debts. In its most recent brief, Plaintiffs avoid any meaningful discussion of the reasonableness of the Secretary's bad debt policy and focus upon an argument that the Secretary has been inconsistent in this policy. Specifically, Plaintiffs suggest that bad debt has been recognized by the Secretary as a separate payment under fee schedules in the past. Plaintiffs present this assertion by mischaracterizing the relevant provisions and misapplying public statements made by the Secretary and his fiscal intermediaries. However, upon careful review of the statements relied upon by the Plaintiffs, the Court will find that not only do they fail to support

Plaintiffs' position but they actually provide further support for the Secretary's longstanding policy. Medicare providers paid under a fee schedule do not receive a separate, additional payment for costs associated with bad debts.

A.    **Regulations at 42 C.F.R. § 413.80 (2000)[1] are Not Applicable to this Dispute**.

1.    Plaintiffs contend that, based on their interpretation of the Secretary's regulation at 42 C.F.R. § 413.80, they are entitled to separate reimbursement for their bad debts. As we pointed out in our previous brief, § 413.80 is a reasonable cost payment principle and is not applicable to payment determinations made under a fee schedule. Plaintiffs argue, however, that simply because the bad debt rules continue to survive and are written in broad terms the Secretary must apply this reasonable cost principle to payments made under other payment methodologies such as a fee schedule. Plaintiff arrives at this conclusion only by obfuscating the language of the § 413.80.

For instance, 42 C.F.R. § 413.80 does not state that the Secretary will apply its provisions to payments under a fee schedule. To the contrary, § 413.80 is a subsection of Part 413 entitled "Principles of Reasonable Cost Reimbursement... ." The bad debt provision is located in, Subpart F entitled "Specific Categories of Costs." The location of

---

[1] The regulation was subsequently recodified at 42 C.F.R. § 413.89, 69 Fed. Reg. 49,254 (Aug. 11, 2004). In addition, the regulation was revised effective January 1, 2007 to clarify that bed debts are not reimbursable under a fee schedule methodology. See 42 C.F.R. § 413.89 (2007). Because the controlling regulation was found at 42 C.F.R. § 413.80 at the time the claimed costs were disallowed, that is the citation used throughout this memorandum.

§ 413.80 provides sufficient notice to providers and the public that the bad debt provision represents a reasonable cost principle. It has no application to any other payment methodology. In particular, § 413.80, unless otherwise specifically noted, has no application in a payment methodology based upon charges such as a fee schedule described at 42 C.

2.      Plaintiffs' reliance on § 413.80's "broad language" for the proposition that bad debts are entitled to separate reimbursement from Medicare regardless of the payment system, is simply not supported by the Federal Rules. Where providers are entitled to additional payments for bad debts under a payment system, it is spelled out in the rules. Just as the rules allow bad debts payment within a reasonable cost reimbursement system (42 C.F.R. § 413.80), the rules specifically allow such reimbursement as an add on payment to the Inpatient Prospective Payment System (IPPS) rates. 42 C.F.R. § 412.115. The allowance of this bad debt add on for IPPS is not inferred from the mere existence of the bad debt rules at § 413.80 as Plaintiffs would suggest, but is specifically incorporated by reference as an add-on to the IPPS rates. However, no such add-on for bad debts is included for the fee schedule rates at 42 C.F.R. Part 414, which are at issue here. Where the Secretary intends to make an additional payment for bad debts he says so.

As the Secretary has explained in his initial brief, hospitals are separately reimbursed for bad debts under the IPPS because, unlike payment rates under the physician fee schedule, IPPS rates are ultimately based on providers' costs rather than

- 3 -

charges. Thus, IPPS rates may not have already accounted for hospitals' bad debts. When the Secretary decided to reimburse providers paid under IPPS for their bad debts he did not rely solely on the language of § 413.80. Instead he *expressly* made § 413.80's bad debt reimbursement provisions applicable to payments under IPPS through § 412.115(a). The section reads:

> An additional payment is made to each hospital in accordance with § 413.80 of this chapter for bad debts attributable to deductible and coinsurance amounts related to covered services received by beneficiaries.

42 C.F.R. § 412.115(a) (2000).

Section 412.115 demonstrates that, even though payment rates under IPPS are ultimately based on costs, the Secretary did not believe that a reasonable cost payment methodology provision like § 413.80 would automatically apply under a completely different payment system. Section 412.115 provides further evidence that the language of § 413.80 is self contained and applies only to cost reimbursement systems. Where the Secretary intends to extend that reimbursement to another payment system, i.e. IPPS, he has incorporated it by reference. No such incorporation appears in the fee schedule rules. This is not an oversight as Plaintiffs' would have the Court believe.

3.      Plaintiffs additionally make much of § 413.80's specific exception of certified registered nurse anesthetists' services from bad debt reimbursement which was mandated by Congress. Plaintiffs would have the Court assume that the inclusion of this exception shows that, where Congress intended to exempt a service paid under a fee

- 4 -

schedule from bad debt reimbursement, it would say so explicitly. A review of the legislative history of the nurse anesthetist's exception recommends another explanation for the exception.

In 1986 Congress mandated that the Secretary pay for nurse anesthetist services under a fee schedule. The Omnibus Budget Reconciliation Act of 1986, Section 9320 (OBRA '86), Pub L. No. 99-509, 9320 (1986); See also 42 U.S.C. 1395l(l)(1)(A). At the same time Congress specifically provided that hospitals not be reimbursed for bad debts associated with the delivery of such services. See Pub L. No. 99-509, 9320 (1986); See also 42 U.S.C. 1395l(l)(5)(B). Consistent with the Secretary's policies, Congress excluded bad debts because anesthetist services were paid under a fee schedule which was a charge based system that already accounted for bad debts. Pub L. No. 99-509, 9320 (1986).

Moreover, it is important to note that the nurse anesthetist legislation was passed 3 years before OBRA '89 mandated the physician fee schedule and 11 years before the BBA '97 required that the specific services at issue in this case be paid under Medicare Part B's physician fee schedule. See id.; See also 42 U.S.C. 1395l(l)(5)(B). Based on this history, it is likely the case that the anesthetist's exception in § 413.80 represents an artifact from the pre-physician fee schedule era when anesthetist's would be paid under what was then a somewhat unique payment system - a fee schedule only for anesthetist services. Indeed, rather than evincing Congress' opinion that the Secretary should only

exempt anesthetists from § 413.80, the exception instead provides the first indication that Congress considered the payment of bad debts under a fee schedule inappropriate.  In establishing the physician fee schedule, the Secretary could reasonably look to the anesthetists exception as evidence that Congress believed that reimbursement for bad debts under a fee schedule was inappropriate.  Certainly, failure to remove the exception after the launch of the physician fee schedule, especially since the exception in no way conflicted with the physician fee schedule or any other law, does not prove that the Congress intended to provide bad debt reimbursement to providers receiving payment under the physician fee schedule.

B.     **The Secretary's Interpretation of His Own Regulation is Reasonable and Deserving of Deference.**

As noted in the Secretary's initial brief, the fee schedule regulation does not include a separate payment for bad debt.  Thus, on the face of the rule no such additional payment is allowed.  Plaintiffs point to no affirmative statement of Congress or the Secretary allowing such additional payment.  At best, they cite to one Congressional provision prohibiting such payment in a fee schedule for anesthetists, a provision consistent with the Secretary's views.  Thus, on the face of the regulation, the Secretary's interpretation is reasonable.

Nonetheless, assuming arguendo, the rule is considered ambiguous, this Court should afford substantial deference to the Secretary's interpretation.  Where the text of a regulation is ambiguous with respect to the precise issue in a case, courts owe "substantial deference" to the agency's interpretation of its own regulation. See Christensen v. Harris

County, 529 U.S. 576, 588 (2000); Tenet HealthSystems Health Corp. v. Thompson, 254 F. 3d 238, 248 (D.C. Cir. 2001) (observing that "[w]hen an agency regulation is silent or ambiguous with respect to the specific point at issue, we must defer to the agency's interpretation as long as it is reasonable"). Thus, the Secretary's interpretation is entitled to "controlling weight" so long as it is neither "plainly erroneous [n]or inconsistent with the regulation." See Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994). When a "challenge calls into question the Secretary's interpretation of her own regulations, [courts] apply a still more deferential standard than that afforded under Chevron." See National Medical Enterprises, Inc. v. Shalala, 43 F.3d 691, 696-97 (D.C. Cir. 1995). Furthermore, it "'is all the more warranted'" where "the regulation concerns a 'complex and highly technical program' like Medicare, 'in which the identification and classification of relevant criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.'" See Tenet HealthSystems, 254 F. 3d at 248 (quoting Thomas Jefferson, 512 U.S. at 512). If more than one plausible construction exists, regardless of whether one construction is superior, the existence of multiple plausible interpretations renders the text ambiguous. See Thomas Jefferson, 512 U.S. at 512 (noting that "[o]ur task is not to decide which among several competing interpretations best serves the regulatory purpose"); Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 702 (1991); General Elec. Co. v. U.S. E.P.A., 53 F.3d 1324, 1327 (D.C. Cir. 1995). In this case the Secretary's rule does not provide for an add on bad debt payment for the

providers paid under the fee schedule.  See 42 C.F.R. Part 414.  Even if the Court assumes, arguendo, that the regulation is ambiguous, the Secretary's reading of his rule is consistent with the plain language of the regulation, is reasonable and should be upheld by the Court.

C.  **The Secretary Has Stated on At Least Two Occasions Prior to 1999 that He Would Not Reimburse Providers for Bad Debts for Services paid Under A Fee Schedule**

Though the regulation itself may be ambiguous, the Secretary has consistently applied his policy regarding bad debt reimbursement.  Through its fiscal intermediary, UGS CMS, stated on February 8, 1996 that, "Medicare's payment of beneficiary deductible and coinsurance bad debts applies only to the reasonable cost payment system established by Section 1861(v)(1)(A) of the Social Security Act (the Act) and implemented in the Code of Federal Regulations (42 C.F.R.) § 412.115(a)".  A.R. at 254.  Soon after this statement, CMS responded to another question regarding bad debt reimbursement as it relates to durable medical equipment.  CMS again stated broadly and unequivocally that, "Medicare payments to a provider of services for the deductible and coinsurance bad debts of medicare beneficiaries applies ONLY to the reasonable cost payment provisions in § 1861(v)(1)(a) of the Social Security Act, as implemented in the regulation at 42 C.F.R. § 413.80.  The bad debt policy does not apply to services for which Medicare payment is based on charges or a fee schedule." (Emphasis in original).  A.R. at 256.  Both of these statements were made almost 3 years before the 1999 fiscal

year at issue in this case, giving Plaintiffs more than enough notice that the Secretary would deny claims for bad debt reimbursement for services paid under the Part B physician fee schedule.

Despite pronouncements like those above, the Secretary found that some in the provider community continued to seek additional bad debt payments - as demonstrated by the instant case. In response, the Secretary ultimately chose to amend § 413.80. However, as stated in the preamble of the final rule which amended § 413.80, CMS:

> "proposed to amend the language in the existing bad debt regulations to clarify that bad debts are not recognized or reimbursed for all covered services paid for under a reasonable charge-based methodology or a fee schedule (68 FR 6682). As stated in that proposed rule, the proposed amendment was intended to clarify our longstanding policy and is not a change in policy."

71 Fed. Reg. 69624, 69712 (December 1, 2006).

Plaintiff's suggestion that this is a new policy is belied by the facts.

**D.    Bad Debt Reimbursement Policy for Dual Eligible QMBs is Wholly Consistent with Prohibition of Bad Debt Reimbursement for Services Paid Under the Part B Fee Schedule.**

Plaintiffs take umbrage at what they characterize as the Secretary's inference that "the intent of Congress was to allow [the Secretary] to reduce reimbursement of SNF part B bad debt arising from services provided to dual eligibles when it enacted the BBA of 1997." Plaintiff's Reply at 8. The Secretary neither intended nor does he believe he has ever made any such inference. While the services at issue in this case may have been

delivered to Medicare beneficiaries who were dual eligible, i.e. Medicare beneficiaries also eligible for some form of Medicaid benefits, it is the Secretary's position that the dual eligible status of the beneficiaries has nothing to do with whether Plaintiffs should be reimbursed for their bad debts. Plaintiffs' insertion of this discussion is a red-herring.

Medicare's cost-sharing program permits certain dual eligible beneficiaries (i.e qualified medicare beneficiaries or QMBs) to have their Medicare premiums, deductibles and coinsurance paid through Medicaid. Any QMB's affected by this case were receiving Part B services while residents in a SNF and may have sought to have their coinsurance and deductibles associated with those services paid by Medicaid. However, the Secretary has never implied that the question of whether he must reimburse the bad debts incurred by providers who provide Medicare Part B services under a fee schedule turns on the dually eligible status of the beneficiary. Instead, the Secretary has maintained for almost two decades that bad debt reimbursement is a creature of a reasonable cost based payment system and, regardless of the status of the beneficiary, bad debt reimbursement is not available for services provided under the physician fee schedule. Characterizing this position as an assault on SNFs' ability to obtain bad debt reimbursement for dual eligible beneficiaries is disingenuous.

Nonetheless, Plaintiffs present Program Memorandum, Transmittal No. A-98-18 and argue that it represents an "acknowledge[ment] that it was Congress' intent that the BBA of 1997 not alter providers' entitlement to reimbursement of bad debts related to

services provided to QMBs." Plaintiff's Reply at 8. First, Plaintiffs inaccurately describe the Program Memorandum conclusion insofar as Plaintiffs imply that HCFA determined that Congress had expressly required that the Secretary leave bad debt reimbursement for services provided to QMBs unchanged. The Program memorandum states that, "[u]pon further examination of the legislative history, it was concluded that Congress had not intended to address this issue and that the language in Section 4714(a) of the BBA did not preclude the medicare program from recognizing the unpaid QMBs' cost sharing as Medicare debt." In other words, CMS determined that Congress had not spoken on the issue of whether the Secretary must reimburse bad debts incurred as part of Medicare's cost-sharing program. Second, the Secretary sent Transmittal No. A-98-18 exclusively to Part A contractors who make payments on behalf of the Medicare program under the IPPS. The transmittal has no bearing on Medicare Part B and says nothing about the applicability of bad debt reimbursement for claims paid under a fee-schedule. Instead, Transmittal No. A-98-18 implicitly reiterates CMS' policy of reimbursing providers of services under Part A for their bad debts. However, this is not at issue here.

**E.    Ambulatory Service Centers (ASCs) are Paid Under a Payment System Different from Part B's Fee Schedule for Physician Services at Issue Here.**

Plaintiffs take two statements made in CMS Federal Register notices regarding ASCs and attempt to show that the Secretary has in the past reimbursed bad debts for services paid under a fee schedule. The first notice predates the existence of the payment system here (established by BBA '97), by almost a decade. The second reference

contains a passing reference to ASCs in the preamble to a rule that has no bearing on the matter before the Court. See Plaintiff's Reply at 11-12. See also 52 Fed. Reg. 36,765, 36,771-72 (Oct. 1 1987); 63 Fed. Reg. 40,954, 40985-86 (July 31, 1998). When Plaintiffs' references are carefully reviewed they prove to be largely irrelevant.

Congress enacted the ASC benefit in December 1980 as part of the Omnibus Budget Reconciliation Act of 1980. In that same legislation, Congress mandated a payment methodology specific to ASCs. The relevant payment provision read as follows:

> (2)(A) The amount of payment to be made for facility services furnished in connection with a surgical procedure specified pursuant to paragraph (1)(A) and furnished to an individual in an ambulatory surgical center described in such paragraph shall be equal to a standard overhead amount established by the Secretary (with respect to each such procedure) on the basis of the Secretary's estimate of a fair fee which--,
> "(i) takes into account the costs incurred by such centers, or classes of center, generally in providing services furnished in connection with the performance of such procedure, and
> "(ii) takes such costs into account in such a manner as will assure that the performance of the procedure in such a center will result in substantially less amounts paid under this title than would have been paid if the procedure had been performed on an inpatient basis in a hospital.

Pub. L. No. 96-499 (1980).

Thus, the provision calls on the Secretary to establish a "fair fee" for the payment of ASC services. The use of the term "fee" might lead one to assume that the payment system in question represents some sort of fee schedule. While this may be correct to some degree, it is misleading. The more relevant language in this provision is found in subparagraphs (i) and (ii) which both require the Secretary to consider "costs" in estimating that fair fee.

Thus, the ASC payment system, which may resemble the fee schedule for physician services in a number of ways, is different in its most critical aspect - payment rates under the ASC payment system are based on costs not charges. In this respect, the ASC system is far more like the Part A Inpatient Prospective Payment System whose rates are also based on costs rather than charges and under which the Secretary continues to reimburse providers for their bad debts. As explained more fully in our previous brief, payment systems with rates based on cost do not necessarily take into account all of the costs a provider may believe necessary to do business, including losses suffered from unpaid deductibles and coinsurance. The payment rates used as part of the fee schedule for physician services, however, are ultimately based on charges which customarily reflect what the providers themselves believed to be their true costs. Indeed, it is a system based upon what the providers themselves set as charges for performing services. Such providers take into account uncollectible debts in setting these charges. Allowing reimbursement of bad debts under a charge based payment system like the physician fee schedule would effectively permit providers to enjoy double reimbursement for their bad debts.

Under the ASC payment system, the Secretary's additional reimbursement of bad debts, as discussed in 52 Fed. Reg. 36, 765, 36,711-72 (Oct. 1 1987), is reasonable and wholly in keeping with his policies. The preamble's reference to ASCs in 63 Fed. Reg. 40.954, 40,985-86 (July 31, 1998) is inaccurate insofar as it implies that the ASC payment

system is identical to the fee schedule for physician services. The careless use of the phrase "fee schedule" to describe the ASC payment system in 63 Fed Reg. 40,954, 40,985-86 (July 31, 1998), while potentially misleading to the uninitiated, clearly does not prove that the ASC payment system and the physician fee schedule are identical. As discussed above, they are different and the Secretary treats each accordingly.

## CONCLUSION

For the forgoing reasons, the Secretary's decision to deny payment for providers' claimed bad debts was reasonable, supported by substantial evidence and consistent with the Medicare statute and regulations. Accordingly, the Secretary respectfully requests that the Court grant his previously filed motion for summary judgment and deny Plaintiffs' motion.

Respectfully submitted,

\_\_/s/_____
JEFFREY A. TAYLOR
United States Attorney
D.C. Bar No. 498610

\_\_/s/_____
CHARLOTTE A. ABEL
Assistant United States Attorney
D.C. Bar No. 388582
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530

(202) 514-7220 / FAX: (202) 514-8780

\_\_/s/_____
BRIAN A. KELLEY
U.S. Department of Health and Human Services
Office of the General Counsel
Centers for Medicare and Medicaid Services
330 Independence Ave., S.W., Room 5309
Washington, D.C. 20201

OF COUNSEL:

DANIEL MERON
General Counsel

MARK D. POLSTON
Acting Associate General Counsel

LARRY HARDER
Acting Deputy Associate General
Counsel for Litigation
United States Department of
Health and Human Services