UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED
MAR 2 8 2008
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | |
|---|---|
| ABINGTON CREST NURSING AND REHABILITATION CENTER, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> MICHAEL O. LEAVITT, *Secretary, Department of Health and Human Services,* <br><br> Defendant. | ) ) ) ) ) ) ) Civil Case No. 06-1932 (RJL) ) ) ) ) ) ) ) ) |

# MEMORANDUM OPINION
(March 28, 2008) [#10, 11]

This case is before the Court on the parties' cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. Plaintiffs, Medicare-certified skilled nursing facilities ("SNFs") owned and/or operated by Extendicare Health Services, Inc. (collectively, "plaintiffs," "Extendicare Facilities," or "Extendicare"), are seeking a reversal of the Secretary of Health and Human Services' ("the Secretary") denial of plaintiffs' request for reimbursement of Medicare "bad debts." Upon review of the pleadings, the administrative record, and the applicable law, the Court upholds the Secretary's decision as reasonable and therefore GRANTS defendant's motion for summary judgment and DENIES plaintiffs' motion for summary judgment.



## BACKGROUND

### I. Statutory and Regulatory Background

#### A. *Medicare Program Generally*

This action arises under Title XVIII of the Social Security Act, more commonly known as the Medicare Act. *See* 42 U.S.C. § 1395 *et seq*. The Act establishes a federally funded health insurance program for the elderly and disabled. *See* 42 U.S.C. §§ 1395c, 1395j, 1395k. Medicare authorizes payment for covered health care services provided by hospitals, skilled nursing facilities, outpatient rehabilitation facilities, and the like. *See id.* §§ 1395x(u), 1395cc. The Medicare insurance program is composed of two parts. Part A of the Medicare insurance program provides insurance coverage for inpatient hospital care. *See id.* § 1395d. Part B provides supplemental coverage for other types of care, including most outpatient therapeutic services. *See id.* § 1395k.

The Medicare program is administered by the Center for Medicare and Medicaid Services ("CMS"), previously the Health Care Financing Administration, on behalf of the Secretary. *See* 42 U.S.C. §§ 1395h, 1395u. CMS's payment and audit functions are contracted out to insurance companies known as fiscal intermediaries. Fiscal intermediaries determine payment amounts due to providers of health care services under Medicare law and the interpretive guidelines published by CMS. *Id.* § 1395h; 42 C.F.R. §§ 413.20(b), 413.24. Providers are required to file Medicare cost reports with their intermediaries, detailing the providers' requests for reimbursement of costs resulting from the provision of health care to Medicare recipients, on an annual basis. 42 C.F.R. § 413.24. The intermediary reviews and audits the cost reports and determines in a notice

2

of program reimbursement ("NPR") the amount of Medicare reimbursement due to the provider for that cost year. *Id.* § 405.1803. If a fiscal intermediary denies a reimbursement, the provider may appeal the decision to the Provider Reimbursement Review Board ("PRRB"). 42 U.S.C. § 1395oo(a). The Secretary has the authority to review the PRRB determination. *Id.* § 1395oo(f)(1). A provider dissatisfied with the final decision of the Secretary may request judicial review of the decision pursuant to 42 U.S.C. § 1395oo(f)(1).

### B. *Payment for Medicare-Covered Services Provided by SNFs*

Over the last decade, Congress has changed the payment methodology (*i.e.*, the rules under which providers are paid for services covered under Medicare) applicable to SNFs. For both Part A and Part B services furnished to Medicare beneficiaries prior to July 1, 1998, Medicare reimbursed SNFs for the "reasonable costs" of these covered services. *See* 42 U.S.C. §§ 1395f(b)(1), 1395x(v)(1)(A). A provider's reasonable costs in turn include "bad debts," which are defined as "amounts considered to be uncollectible from accounts and notes receivable that were created or acquired in providing services" and include "the costs attributable to the deductible and coinsurance amounts that remain unpaid [which] are added to the Medicare share of allowable costs." 42 C.F.R. § 413.80(b), (d).[1] These bad debt provisions were adopted, pursuant to congressional

---

[1] This regulation was subsequently recodified at 42 C.F.R. § 413.89, *see* Medicare Program – Changes to Inpatient Prospective Payment Systems, 69 Fed. Reg. 48,916, 49,254 (Aug. 11, 2004), and was revised effective January 1, 2007, to clarify that "[b]ad debts arising from covered services paid under a reasonable charge-based methodology or a fee schedule are not reimbursable under the program." 42 C.F.R. § 413.89(i). Because the controlling regulation at the time the claimed costs were disallowed was found at 42 C.F.R. § 413.80, citations herein are

directive, to ensure that the "costs of efficiently delivering covered services to individuals covered by the insurance programs established by [Medicare] will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs." 42 U.S.C. § 1395x(v)(1)(A); *see also* 42 C.F.R. § 413.80(d) (regulation adopting similar provision). This is known as the "prohibition on cross-subsidization" or the "anti-cross subsidization principle." *See* Medicare Program – Provider Bad Debt Payment, 68 Fed. Reg. 6,682, 6,683 (Feb. 10, 2003).

With the enactment of the Balanced Budget Act of 1997 ("BBA of 1997"), Congress eliminated the reasonable cost scheme for SNFs. In its place, Congress enacted a prospective payment system based on a federal per diem rate for Part A services and provided that Part B services would be paid for according to a physician fee schedule set forth at Section 1848 of the Social Security Act. *See* 42 U.S.C. §§ 1395yy(e)(9), 1395l(a)(8), 1395m. The implementing regulations reflect this change in the payment methodology for SNFs:

> The amount paid for [SNF] services . . . (i) That are furnished in cost reporting periods beginning on or after July 1, 1998, to a resident who is in a covered Part A stay, is determined in accordance with the prospectively determined payment rates for SNFs established under section 1888(e) of the Act, as set forth in subpart J of this part. (ii) That are furnished on or after July 1, 1998, to a resident who is not in a covered Part A stay, is determined in accordance with any applicable Part B fee schedule or, for a particular item or service to which no

made to 42 C.F.R. § 413.80 (1999).

>   fee schedule applies, by using the existing payment
>   methodology utilized under Part B for such item or service.

42 C.F.R. § 413.1(g)(2). Since the enactment of the BBA of 1997, the Secretary has continued to reimburse bad debts arising under the Part A prospective payment system but has not reimbursed bad debts arising under the Part B fee schedule.

## II. Factual and Procedural Background

At issue in this dispute is the Secretary's final administrative decision, disallowing plaintiffs' reimbursement claim for bad debts arising from Part B services. The 21 plaintiffs in this case are Medicare-certified skilled nursing facilities owned and/or operated by Extendicare. (Compl. ¶ 4.) The Extendicare Facilities provide, *inter alia*, physical, occupational, and speech therapy services to residents who require such services. (*Id.* at ¶ 6.) For residents who have insurance coverage provided by the Medicare program, some of these therapy services are subject to payment under Parts A and B of the Medicare program. (*Id.*)

In their fiscal year 1999 Medicare cost reports, plaintiffs claimed reimbursement for bad debts related to certain uncollectible deductibles and coinsurance arising from therapy services payable under the Part B fee schedule. (*Id.* at ¶ 23.) United Government Services LLC, plaintiffs' intermediary, audited the 1999 cost reports. (*Id.* at ¶¶ 7, 24.) On or around September 26, 2001, the intermediary issued each plaintiff a NPR, disallowing the Part B bad debt claims. (*Id.* at ¶ 25.) On or around March 12, 2002, each plaintiff filed an individual appeal with the PRRB. (*Id.* at ¶ 26.) Plaintiffs requested that the PRRB permit them to pursue the Part B bad debt issue as a group appeal, pursuant to

5

PRRB procedures. (*Id.* at ¶ 28.) The PRRB granted this request and the appeal proceeded as a group appeal. (*Id.*) On February 3, 2005, the PRRB conducted a hearing on the Part B bad debt issue and, on July 21, 2006, issued its decision, wherein it determined that "[t]he Intermediary's adjustment to the Providers' uncollectible deductibles and coinsurance arising from therapy services paid under the Part B fee schedule was improper." (A.R. 56-66;[2] Compl. ¶¶ 31, 32.)

The intermediary and CMS requested review of the PRRB's decision. (A.R. 49-55.) The Secretary, acting through his designated agent, the Deputy Administrator of CMS, issued a final determination in the form of an Administrator's Decision on September 12, 2006, reversing the PRRB's decision and finding that plaintiffs were not entitled to reimbursement of uncollectible deductibles and coinsurance arising from therapy services paid under the Medicare Part B fee schedule. (Compl. ¶ 33; A.R. 2-17.) The Secretary reasoned:

> Applying the law to the facts of this case, the Administrator finds that the Intermediary properly denied the Providers' claimed Medicare bad debts relating to uncollectible deductibles and coinsurance arising from therapy services provided to patients who were not in a covered Part A stay and for which payment was determined in accordance with the Part B fee schedule. The Administrator finds that the BBA of 1997 changed the basis of payments from reasonable cost to a fee schedule for these services. Medicare's longstanding policy has been not to pay for bad debts for any services paid under a reasonable charge or fee schedule methodology.

(A.R. 12.)

---

[2] Herein, "A.R." refers to the Administrative Record.

Plaintiffs now move for summary judgment, claiming that the Secretary's final administrative decision is arbitrary and capricious, an abuse of discretion, and not in accordance with the governing law and thereby constitutes a violation of 5 U.S.C. § 706(2)(A). Defendant, Michael Leavitt, in his official capacity as Secretary of the Department of Health and Human Services ("HHS"), also moves for summary judgment, claiming that the Secretary's decision was reasonable and consistent with the controlling Medicare law and regulations. For the following reasons, the Court agrees with the defendant.

## LEGAL STANDARDS

### I. Legal Standard for Summary Judgment

Under Rule 56, summary judgment is appropriate when the pleadings and the record demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and the Court draws all reasonable inferences regarding the assertions made in a light favorable to the non-moving party, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Similarly, in ruling on cross-motions for summary judgment, the court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed. Summary judgment is also appropriate where, as

here, review is on the administrative record."[3] *GCI Health Care Centers, Inc. v. Thompson*, 209 F. Supp. 2d 63, 67-68 (D.D.C. 2002) (citations omitted).

## II. Legal Standard for APA Review of Secretary's Decision

Section 1395oo(f) of Title 42 provides for judicial review of final Medicare provider reimbursement decisions under the standards set forth in the Administrative Procedures Act ("APA"), 5 U.S.C. § 701 *et seq.* The APA in turn requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).[4] The scope of review under the arbitrary and capricious standard is narrow and a court must not substitute its judgment for that of the agency. *Motor Veh. Mfrs. Ass'n v. State Farm Mutual Ins. Co.*, 463 U.S. 29, 43 (1983). Rather, the Court

---

[3] The parties in this case have not raised any disputed issues of material fact. (*See* Def.'s Concise Stmt. Genuine Issues [Dkt. #11] 1; Pls.' Concise Stmt. Genuine Issues [Dkt. #15-2] 1.)

[4] Defendant contends that the Secretary's decision is supported by all applicable law and regulations, under 5 U.S.C. § 706(2)(A), and also is supported by substantial evidence, under 5 U.S.C. § 706(2)(E). (Def.'s Mem. Supp. Summ. J. 8-9.) Plaintiffs, however, do not raise any claims under the substantial evidence standard and the Court finds that the Secretary's decision is more appropriately reviewed under the APA's arbitrary and capricious standard, as plaintiffs do not assert that the Secretary's decision lacked support in the record. Nonetheless, whether the Secretary's decision is more appropriately reviewed under the arbitrary and capricious standard or the substantial evidence standard is of little, if any, practical consequence since both standards "involve the same level of scrutiny." *Memorial Hospital/Adair County Health Ctr., Inc. v. Bowen*, 829 F.2d 111, 117 (D.C. Cir. 1987) ("While the substantial evidence test concerns support in the record for the agency action under review, the arbitrary and capricious standard is a broader test subsuming the substantial evidence test but also encompassing adherence to agency precedent. Thus the substantial evidence test is that aspect of the arbitrary and capricious test usually applied to review of agency adjudications, but its use does not connote stricter scrutiny of agency action. . . . [W]e conclude that although the Board's adherence to Medicare regulations is reviewable under the arbitrary and capricious standard, and the sufficiency of the Board's record is reviewable under the substantial evidence standard, the two standards involve the same level of scrutiny."); *see also Larkin Chase Nursing & Restorative Ctr. v. Shalala*, 2001 WL 34035688, at *5 (D.D.C. 2001). Accordingly, the Court will proceed under the arbitrary and capricious standard of the APA, 5 U.S.C. § 706(2)(A).

must simply determine whether the agency's action is "within the bounds of reasoned decisionmaking." *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 105 (1983). This deferential standard presumes the agency action to be valid, *Kisser v. Cisneros*, 14 F.3d 615, 618 (D.C. Cir. 1994), and "[t]he burden of showing that the agency action violates the APA standards falls on the provider." *Heartland Regional Medical Ctr. v. Leavitt*, 511 F. Supp. 2d 46, 51 (D.D.C. 2007) (citing *Diplomat Lakewood Inc. v. Harris*, 613 F.2d 1009, 1018 (D.C. Cir. 1979)).

In reviewing an agency's interpretation of its own regulations, the Court must afford the agency substantial deference, giving the agency's interpretation "controlling weight unless it is plainly erroneous or inconsistent with the regulation."[5] *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (quotations omitted); *see also Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 52 (D.C. Cir. 1999) (stating that the review in "such cases is more deferential . . . than that afforded under *Chevron*") (citations and quotations omitted); *Qwest Corp. v. Fed. Communications Comm'n*, 252 F.3d 462, 467 (D.C. Cir. 2001) (stating that the court would reverse an agency's reading of its regulations only in cases of a "clear misinterpretation"). "A court need not find that the agency's construction is the only possible one, or even the one that the court would have adopted in the first instance. . . . So long as an agency's interpretation of ambiguous

---

[5] Plaintiffs do not directly challenge the validity of the bad debt regulations, but instead challenge the Secretary's interpretation of these regulations in denying their claims for reimbursement of bad debts arising from Part B services. (*See* Pls.' Mem. Supp. Summ. J. 1.) In addition, although plaintiffs suggest that the Secretary's interpretation may run afoul of the APA's notice-and-comment procedures, 5 U.S.C. § 553, plaintiffs have provided no support for their contention that this interpretation amounted to a substantive rule change, in violation of the APA's notice-and-comment procedures. (*See* Pls.' Mem. Supp. Summ. J. 14; Pls.' Reply 12-13, 15.)

regulatory language is reasonable, it should be given effect." *Wyo. Outdoor Council*, 165 F.3d at 52 (citations omitted). Thus, "in a competition between possible meanings of a regulation, the agency's choice receives substantial deference." *Rollins Envtl. Servs., Inc. v. EPA*, 937 F.2d 649, 652 (D.C. Cir. 1991).

"This broad deference is all the more warranted when, as here, the regulation concerns 'a complex and highly technical regulatory program,' in which the identification and classification of relevant 'criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.'" *Thomas Jefferson Univ.*, 512 U.S. at 512 (quoting *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 697 (1991)); *see also Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1229 (D.C. Cir. 1994) ("[I]n framing the scope of review, the court takes special note of the tremendous complexity of the Medicare statute. That complexity adds to the deference which is due to the Secretary's decision.").

## ANALYSIS

The issue before the Court is a narrow one:  Was the Secretary's interpretation of the applicable Medicare law and regulations, to deny the reimbursement of bad debts arising from Part B services provided by Extendicare Facilities, a reasonable construction of the regulations?  The Court finds that it was.  How so?

The bad debt regulations, 42 C.F.R. § 413.80 *et seq.*, do not specifically address whether bad debts arising from the provision of Part B services by SNFs are reimbursable.  Instead, the bad debt reimbursement provisions simply lay out the Secretary's general policy that "the costs attributable to the deductible and coinsurance

amounts that remain unpaid are added to the Medicare share of allowable costs."
42 C.F.R. § 413.80(d); *see also id.* § 413.80(e) (setting out the specific criteria that bad debts must met to be allowable).[6] Contrary to plaintiffs' claims, the Secretary's determination that the bad debt provisions are not applicable to services paid under a fee schedule is certainly plausible given the ambiguity of the regulation's text. Indeed, the Court must defer to the Secretary's interpretation so long as it is reasonable.[7] *See Tenet HealthSystems HealthCorp. v. Thompson*, 254 F.3d 238, 248 (D.C. Cir. 2001) ("When an agency regulation is silent or ambiguous with respect to the specific point at issue, we must defer to the agency's interpretation as long as it is reasonable.").

The key to the Secretary's interpretation that the bad debt reimbursement provisions are not applicable to the Part B fee schedule was his conclusion that "[w]hile 42 CFR 413.80. *et. seq.*. [sic] does not address bad debt payment to providers paid under a fee schedule individually for each type of fee schedule payment, the bad debt provision arises from the reasonable 'cost' anti-cross-subsidization provisions which is [sic] not

---

[6] It is undisputed that plaintiffs have supported their bad debt claims as required under the criteria set forth in 42 C.F.R. § 413.80(e). (*See* A.R. 134-38, 1028-33.) Thus, the only issue before the Court is whether the Secretary's interpretation of the law and regulations governing the Medicare program's reimbursement of bad debts arising from services paid under the Part B fee schedule is reasonable.

[7] Contrary to plaintiffs' suggestion that the Secretary should have explicitly limited bad debt reimbursement for Part B services through regulation if he intended to do so, (*see* Pls.' Mem. Supp. Summ. J. 21-22), "HHS does not have a statutory duty to promulgate regulations that 'address every conceivable question in the process of determining equitable reimbursement.'" *Tenet HealthSystems HealthCorp. v. Thompson*, 254 F.3d 238, 248 (D.C. Cir. 2001) (quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 96 (1995)). Rather, for "particular reimbursement details not addressed by [the] regulations, the Secretary relies upon an elaborate adjudicative structure which includes the right to review by the [PRRB], and, in some instances, the Secretary, as well as judicial review in federal district court of final agency action." *Guernsey Mem'l Hosp.*, 514 U.S. at 96.

11

controlling under the reasonable charge/fee methodology set forth at § 1848 of the [Medicare] Act. Thus, the bad debt provisions . . . do not apply to services for which Medicare payment is based on reasonable charges or a fee schedule methodology." (A.R. 12.) For the following reasons, the Court finds this interpretation of the text and structure of the applicable law reasonable and persuasive.

The bad debt provisions were originally adopted to carry out Congress' anti-cross subsidization principle, which is a feature of the reasonable cost system. In its definition of the term "reasonable costs" in the Medicare Act, Congress laid out the prohibition on cross-subsidization, instructing the Secretary to establish a methodology for determining reasonable costs so that the "costs of efficiently delivering covered services to individuals covered by the insurance programs established by [Medicare] will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs." 42 U.S.C. § 1395x(v)(1)(A). To carry out Congress' anti-cross subsidization policy, HHS adopted the bad debt reimbursement provisions, establishing that Medicare pay bad debts for services rendered under a reasonable cost system. *See* 42 C.F.R. § 413.80(d) ("To assure that such covered service costs are not borne by others, the costs attributable to the deductible and coinsurance amounts that remain unpaid are added to the Medicare share of allowable costs."); *see also* 68 Fed. Reg. at 6,683. Given this statutory and regulatory structure, the Secretary's determination that the bad debt reimbursement policy is a feature exclusively of the reasonable cost system is sensible.

Moreover, payment under a fee schedule is not related to the actual cost outlay by

12

the provider and therefore does not encompass the concept of unrecovered costs or bad debts. (*See* A.R. 12.) Under a reasonable cost system, Medicare pays for "the cost actually incurred" by the provider for services rendered, *see* 42 U.S.C. §§ 1395f(b)(1), 1395x(v)(1)(A), including "unrecovered costs attributable to uncollectible deductible[s] and coinsurance." *See* Medicare Program – Revisions to Payment Policies, 71 Fed. Reg. 69,624, 69,712 (Dec. 1, 2006). By contrast, "[u]nder a fee schedule, Medicare makes payment for a specific service for which there is a predetermined rate which includes a margin for profit and which reflects the price of doing business." (A.R. 12); *see also* 42 U.S.C. § 1395w-4 (establishing the physician fee schedule). Given this framework, the Secretary's determination that the payment under a fee schedule is not related to the actual cost of the service provided and does not embody the concept of unrecovered costs or the principle of bad debt is sound.[8] Accordingly, the Secretary's final administrative decision, finding that "the bad debt provisions . . . do not apply to services for which Medicare payment is based on reasonable charges or a fee schedule methodology," (A.R. 12), is a reasonable reading of the applicable law and regulations. *See, e.g., Cold Spring Granite Co. v. Federal Mine Safety & Health Review Comm'n*, 98 F.3d 1376, 1378 (D.C. Cir. 1996) ("The Secretary's plausible and sensible reading of his own regulation would

---

[8] CMS has reiterated its understanding that the concept of unrecovered costs does not apply to fee schedule systems. *See* 68 Fed. Reg. at 6,683 ("Under a fee schedule or reasonable charge methodology, Medicare reimbursement is not based on costs and, therefore, the concept of unrecovered costs is not relevant."); 71 Fed. Reg. at 69,712 ("Under a fee schedule or reasonable charge methodology, Medicare does not share proportionately in an entity's incurred costs but rather makes payment for a specific service. The payment is not related to the cost of a service and thus, does not embody the concept of unrecovered costs due to uncollected amounts of deductibles and coinsurance.").

prevail even if the [plaintiff] had presented an equally plausible alternative construction, which it has not.")

Plaintiffs' attempt to avoid this conclusion by arguing that the Secretary has been inconsistent in his application of the bad debt reimbursement policy is to no avail.[9] Indeed, plaintiffs' argument that the Secretary "should" reimburse providers for bad debts arising from Part B covered services, because both the Part A and Part B payment systems are based on predetermined payment rates and bad debts are still reimbursed under the Part A prospective payment system, is simply unsupported. (*See* Pls.' Mem. Supp. Summ. J. 20-22; Pls.' Reply 6-8.) First, the payment rates under a prospective payment system are based on *costs*, not charges. See 42 U.S.C. § 1395yy(e)(4)(A); 42 C.F.R. § 413.337(a). As the Secretary explained, the costs used to construct these payment rates do not typically include costs of bad debts, and, Medicare therefore continues to pay for bad debts arising under the inpatient prospective payment system.[10]

---

[9] Additionally, the Court does not find persuasive plaintiffs' bald assertion that "Congress would have explicitly limited bad debt reimbursement when it adopted the prospective payment and Part B fee schedule system for SNFs [in the BBA of 1997] if it had intended to do so." (Pls.' Mem. Supp. Summ. J. 13.) As explained in further detail above, since the bad debt reimbursement policy is an exclusive feature of the reasonable cost system, Congress' adoption of a fee schedule system for Part B services provided by SNFs eschews the need to address this specific issue through legislation. *See supra* p. 12. Indeed, even assuming *arguendo* that Congress' intent with respect to the applicability of bad debt reimbursement in this context was not clear, the question for the Court would simply be whether the agency's interpretation is based on a permissible construction of the statute. *See, e.g., Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). For the reasons already set forth above, the Court concludes that the Secretary's decision to deny the payment of bad debts under the Part B fee methodology is consistent with the controlling language of the Medicare Act.

[10] CMS has affirmed its position that Medicare continues to reimburse providers for bad debts incurred under some prospective payments systems. *See* 71 Fed. Reg. at 69,712 ("[P]ayment of bad debt applies only to services reimbursed on the basis of reasonable cost or to services paid under one of Medicare's prospective payment systems that have a basis in reasonable costs that

14

(*See* A.R. 14); *see also* 68 Fed. Reg. at 6,683 (noting that entities currently eligible to receive bad debt payments under prospective payment systems include hospitals and skilled nursing facilities). By contrast, the Part B physician fee schedule is based on the amount providers *charge* for services, which historically has taken into account the costs of uncollectible deductibles and coinsurance. *See* 42 U.S.C. § 1395w-4 (computing fee schedule rates based on the average charges for the service provided); *see also* 68 Fed. Reg. at 6,683 ("Fee schedules, which are either charge-based or resource-based, relate payments to the price the entity charges. Historically, these prices have reflected the entities cost of doing business, including expenses such as bad debt."). Second, the Secretary has explicitly provided that bad debts would be reimbursed for services provided under the inpatient prospective payment system. *See, e.g.*, 42 C.F.R. § 412.115 ("An additional payment is made to each hospital in accordance with § 413.80 of this chapter for bad debts attributable to deductible and coinsurance amounts related to covered services received by beneficiaries."). Simply put, no such rule exists for services provided under the physician fee schedule applicable to Part B services.

Thus, for all the foregoing reasons, the Court finds that the Secretary's interpretation, denying the reimbursement of bad debts arising from Part B services provided by plaintiffs, is reasonable, as it is supported by the regulations' text and overall

---

do not reflect Medicare payment of bad debts during a specified provider base period."); 68 Fed. Reg. at 6,683 ("[I]n accordance with our regulations, we have continued to recognize bad debt for entities receiving payment under a [prospective payment system], such as for inpatient hospital services (42 CFR 412.115(a)), where Medicare payment policy, before [prospective payment system], recognized payment of those bad debts and where the prospective payments were derived from costs that did not reflect base period Medicare bad debts.").

structure, and thus is not arbitrary or capricious, an abuse of discretion, or contrary to law.

## CONCLUSION

Accordingly, the Court GRANTS defendant's Motion for Summary Judgment and DENIES plaintiffs' Motion for Summary Judgment. An appropriate Order consistent with this ruling accompanies this Opinion.

_____
RICHARD J. LEON
United States District Judge